GEORGE LEWIS, WILLIAM C. LEWIS JAMES MESSER, WM. E. GRAY, GEO. W. RHODES, W. T. MOORE, G. B. STRICKLAND, AND W. D. STOUTAMIRE, TAXPAYERS AND CITIZENS OF LEON COUNTY, FLORIDA, INTERVENORS, *Appellants* v. LEON COUNTY, *Petitioner, Appellee.*

En Banc.

Opinion Filed January 23, 1926.

120

W. J. *Oven*, for Appellants;

*Myers & Myers*, for Appellee.

Brown, C. J.—This is an appeal from a decree validating an issue of bonds by the County of Leon in a proceeding brought by said county under Section 3292 to 3301 of the Revised General Statutes of 1920. The county filed its petition and, as required by the statute, the State was made the party defendant thereto, and the State Attorney of the Second Judicial Circuit, who is directed by the statute to represent the State in such proceedings, filed an answer to the effect that he had carefully examined the petition and that, from the same, he did not see any legal reason why the said bonds should not be validated. An interven-

tion was filed in said cause by George Lewis and others, citizens and taxpayers of said county, objecting to the validation of said bonds upon grounds hereinafter referred to, and embracing in their answer a demurrer to said petition. The petitioner filed a moiton to strike each paragraph of the answer filed by the intervenors, and also the entire answer, upon various grounds. In its final decree the court below overruled the demurrer of the intervenors to the petition, granted the petitioner's motion to strike the answer of the intervenors, and decreed the validation of said bonds. From said decree, intervenors have taken this appeal.

The first paragraph of the county's petition reads as follows:

"1. That on the 16th day of March, A. D. 1925, the County Commissioners of Leon County, at a meeting of said Board at which all the members thereof were present, acting under the provisions of Section 1531, 1533 and 1534 of the Revised General Statutes of the State of Florida, adopted a resolution declaring that the said Board deemed it expedient and for the best interest of said County to issue bonds of said County for the purpose of constructing and aiding in the construction of paved, macadamized, or other hard-surfaced highways in said County, and that such bonds be issued for the purpose aforesaid in the sum of one million five hundred thousand dollars, in denominations of one thousand dollars each, to be dated July 1st, 1925, and to be payable as follows: $20,000 on the first day of July in each of the five years of 1931 to 1935, inclusive; $40,000 on the first day of July in each of the five years of 1936 to 1949, inclusive; $60,000 on the first day of July in each of the five years of 1941 to 1945, inclusive; $80,000 on the first day of July in each of the five years of 1946 to 1950, inclusive; and $100,000 on the first day of

July in each of the five years of 1951 to 1955, inclusive; each of said bonds to bear interest from date at the rate of five per cent per annum payable semi-annually, such interest on each bond to be represented by coupons of $25.00 each falling due and payable every six months; and that the net proceeds derived from the sale of said bonds, after deducting the expenses of issue, sale and administration, shall be apportioned to and expended on the several paved, macadamized, or other hard-surfaced roads to be constructed, or the construction of which is to be aided, by the issue and sale of said bonds, as follows, to-wit: ·

"State Road No. 1 through the County of Leon from the Jefferson County line to the Gadsden County line, approximately $260,000.

"State Road No. 10 from the Georgia line to Tallahassee, approximately $270,000.

"State Road No. 10 from Tallahassee to Woodville, approximately $214,000.

"State Road No. 19 as now designated, or other road from the eastern limit of the City of Tallahassee to the Jefferson County line in the direction of Williston, or some point south of Williston on State Road No. 5, approximately $325,000.

"The Jackson Bluff Road from Tallahassee to Ocklocknee River, approximately $196,000.

"The Springhill Road, approximately $25,000.

"The Crawfordville Road, approximately $25,000.

"The road from Woodville to Natural Bridge, approximately $25,000.

"The road from Miccosukie to State Road No. 1, approximately $110,000.

"The roads from the eastern limit of the City of Tallahassee on an extension of Park Avenue and Lafayette

street to a connection with State Road No. 19, approximately $50,000."

A certified copy of the complete resolution is attached to and made a part of the petition.

The grounds of objection to the validation of the bonds as contained in the answer of the intervenors will be hereinafter made to appear in the discussion of their sufficiency.

No questions are raised by the intervenors as to the regularity or sufficiency of the proceedings for the issue of the bonds sought to be validated. The proceedings are refreshingly free from any procedural irregularities or technical defects.

The questions raised by the intervenors may be grouped under two general heads: (1) lack of power by the Board of County Commissioners to issue said bonds for the purpose declared by the resolution, and, (2) abuse of the power conferred on the County Commissioners to issue bonds for such declared purpose. That such questions may properly be presented in the answer of intervenors resisting the petition for validation, was held by this court in the case of Thompson v. Town of Frostproof, — Fla. —, 105 So. 118; it being the purpose of a decree validating and confirming bonds under the law of this state to put in repose all questions of law or fact that may be raised affecting the validity of such bonds.

1. The first question raised by the intervenors, appellants here, is the constitutional authority *vel non* of Leon County to issue bonds for constructing, or aiding in the construction of State roads, it appearing from the paragraph of the petition above quoted that the larger part of the proceeds of said bonds would be apportioned to and expended upon certain state roads. Appellants contend that this action is void, as being in conflict with Section 5,

Article 9, of the State Constitution, which reads in part as follows: ''The Legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes.''

Is the aiding by a county in the construction of that part of a State road or roads passing through or located in such county, a county purpose within the meaning of the constitution? Appellants contend that it is not; that our statutory system with reference to highways has reached that point of development where the roads designated by the legislature and the State Road Department as State roads are so exclusively the property of and under the control of the State, and so much a matter of state-wide importance and concern, that to aid in their construction or maintenance cannot be considered a county purpose.

This presents a very interesting and important question. In fact, any question affecting the vital matter of adequate roads is necessarily important. This is so, not only in the light of current events and the history of recent and modern times, in our own country, of which the courts take judicial knowledge, but it is also true in the light of the history of other countries and of ancient times as well. History proves that this matter of good roads and facilities for transportation and inter-communication forms one of the essential bases for the growth, development and support of a great civilization. This was one of the secrets of the upbuilding and maintenance of the greatest empire and civilization of ancient times—the Roman Empire—which endured for twelve centuries, and which crumbled and fell, not by reason of blows from without, but because of internal causes—the deterioration and decay of the moral character and fibre of its people. After referring to the nu-

merous populous and prosperous cities of the far-flung Roman Empire in its prime, Gibbon says:

"All these cities were connected with each other, and with the capital, by the public highways, which, issuing from the Forum of Rome, traversed Italy, pervaded the provinces, and were terminated only by the frontiers of the empire. If we carefully trace the distance from the wall of Antoninus to Rome, and from thence to Jerusalem, it will be found that the great chain of communication, from the northwest to the southeast point of the empire, was drawn out to the length of four thousand and eighty Roman miles. The public roads were accurately divided by milestones, and ran in a direct line from one city to another, with very little respect for the obstacles either of nature or private property. Mountains were perforated, and bold arches were thrown over the broadest and most rapid streams. The middle part of the road was raised into a terrace which commanded the adjacent country, consisted of several strata of sand, gravel and cement, and was paved with large stones, or, in some places near the capital, with granite. Such was the solid construction of the Roman highways, whose firmness has not entirely yielded to the effort of fifteen centuries. They united the subjects of the most distant provinces by an easy and familiar intercourse; but their primary object had been to facilitate the marches of the legions; nor was any country considered as completely subdued till it had been rendered, in all its parts, pervious to the arms and authority of the conqueror."

Along with the English Common Law, our forefathers brought over to this country the policy, prevailing under that law in the British Isles, where they called them the "The King's Highways," of leaving the care and upkeep of the roads, highways and bridges, and the expense there-

of, to the local authorities, though they were open, of course, to the use of the general public. This system, with more or less modification, was generally pursued throughout the different States of the Union until comparatively recent times. Thus it was for a long time (and still is with some recent modifications) the law of this State that the County Commissioners of each county were vested with the power to lay out, establish, alter, maintain, or discontinue roads and highways, and were given the general superintendence of all the public roads within their respective counties. While this power was vested in the county authorities by the Legislature, it was generally understood, and so held by our courts, that the Legislature retained and could exercise, when desired, plenary control over all the public highways, in the state, whether they were public county roads or streets in cities and towns. Duval County v. Jacksonville, 36 Fla. 196; 18 So., 339; Stewart v. Road District, 71 Fla., 158, 187; Keggins v. Hillsborough County, 71 Fla., 356. The remarkable building and extension of railroads in this country, to some extent diverted attention from, and made for a time less imperative the need for the development of the public roads until comparatively recent times. With the rapid growth of the country and especially since the coming into general use of the automobile, there has developed in many of the States of the Union the establishment of State Highway Boards or Commissions for the purpose of affording a general co-ordinated system of state highways which could not be effected very satisfactorily through the old system of independent and more or less unrelated county management. The Federal government also, in 1916, enacted a law for federal aid to the States in the construction of roads which its duly appointed authorities decide to be of national importance. The Legislature of this State commenced to provide for the formation of special road and bridge districts and, finally, in

1915, a new state-wide system was initiated by the creation of a State Road Department consisting of five persons to be appointed by the Governor, one from each Congressional District and one from the state at large, and this department was authorized to employ a State Road Commissioner who should be a competent and efficient road builder. It was made the duty of the department to collect information as to the roads in the state, to make maps and plats, and collect data as to the best methods and materials for road building, and to furnish this information to the County Commissioners. It was made the duty of the Road Commissioner to visit the several counties and inspect the roads, and to make recommendations for their construction and repair, and where work was being improperly done to notify the County Commissioners. Very little power was vested by this modest original enactment in the Road Department except as a bureau of information, inspiration, and supervision for the benefit of the County Commissioners. See Chapter 6883, Laws of 1915, Chapter 7323, Laws of 1917, Chapter 7900 of the Laws of 1919, and Sections 1192-1202, Rev. Gen. Stats. of 1920. This initial act was amended from time to time until now we have a State Road Department with considerable powers and a relatively complete and co-ordinated system of state highways, partly constructed, or in course of construction, or planned and designated and awaiting their turn for construction in the order fixed by statute. Taxes, both ad valorem and excise on gasoline for the benefit of the state roads, have been levied by successive acts until now the total gasoline tax is 4c per gallon, three cents going to the State and one cent distributed among the various counties.

Section 1531 of the Revised Gen. Stats. of 1920, being Section 1 of Chapter 4711 of the Laws of 1899, reads as follows: "Whenever the board of county commissioners

of any county shall deem it expedient, or to the best interests of such county, to issue the county bonds of their county, *for the purpose of constructing paved, macadamized, or other hard-surfaced highways,* or erecting a court house or jail, or other public buildings, and funding the outstanding indebtedness of the county, *or for any of such purposes,* they shall determine by resolution to be entered in their records, what amount of bonds is required for such purpose, the rate of interest to be paid thereon, and the time when the principal and interest of such bonds shall be due and when payable.'' (Italics ours).

By the Acts of June 14, 1921, Chapter 8553 of the Laws of Florida, it was provided that any county, or special road and bridge district, was authorized to ''aid in the construction or maintenance of any state or state aid road'' by contributions to the State Road Department of cash, bonds, or time warrants, and the State Road Department was authorized to receive such aid and contributions and to dispose of and use the same in the construction of any state or state aid road, and the State Road Department was granted authority to enter into agreements with the County Commissioners of several counties in which county road bonds had been or might thereafter be voted by the people of said county, and in which one or more roads of said county had been or should thereafter be designated as a part of the system of state highways, or as a state aid road, whereby the State Road Department should construct the roads and bridges incident thereto, ''which shall be or shall have been so voted to be constructed by the people,'' and ''in accordance with the specifications which might be agreed upon between the State Road Department and the County Commissioners of said county;'' and that the proceeds of the sale of such county bonds so contributed should be used only for the purpose for which the contribution was made.

In June, 1923, the Legislature adopted an act, Chapter 9312 of the Laws of 1923, giving the State Road Department the power of eminent domain, and making it the duty of said department to maintain the state roads and to protect and preserve the same from trespass and injury and to prevent the use of traffic thereupon which would be liable to injure the same.

Section 7 of this act reads as follows: "The term 'state road' used in this Act is defined and shall be construed to mean such road or part of road which has been or may be established, declared and designated by the State Road Department or the Legislature as a State road and the location of the line and right of way of which has been surveyed and fixed upon by the Department or its duly authorized engineers and representatives."

During the same session of the Legislature, Chapter 9311 was adopted, which act designated and established certain named and numbered roads as "State Roads," among them being the following:

"Road No. 1. Extending from the Alabama State Line at Nunez Ferry and from Flomaton to Jacksonville, passing through Pensacola, Milton, Crestview, DeFuniak Springs, Bonifay, Chipley, Marianna, Cypress, Chattahoochee, Quincy, Havana, Tallahassee, Monticello, Greenville, Madison, Live Oak, Lake City, Sanderson, MacClenny and Baldwin.

"Road No. 10. Extending from the Georgia State Line near Beachton to East Point, via Tallahassee, Crawfordville, Blocker's Ferry and Carrabelle.

"Road No. 19. Extending from State Road No. 1, east of Tallahassee to Williston, via Perry, Cross City and Bronson.

Following the list of roads so designated, said act provided, "That the above named and numbered roads shall

be and constitute the system of State Roads of this State, and when located and constructed by the State Road Department shall become and, be the property of the State."

Section 3 of this act provided, "That the State Road Department is hereby vested with authority to determine and fix the lines and locations of such roads between the cities and places thereon named in Section one of this Act.

Such was the status of the law when the resolution of March 16, 1925, was adopted by the County Commissioners of Leon County.

On June 1, 1925, the Legislature adopted Chapter 10269 amending Section 1 of Chapter 9311, which had been adopted in 1923, so as to make certain changes in the descriptions of certain of the state roads already designated by the former act and adding additional designations of state roads. Thereby State Road No. 1 was described as follows: "Road No. 1. Extending from the Alabama State Line at Nunez Ferry to Jacksonville, passing through Pensacola, Milton, Crestview, DeFuniak, Bonifay, Chipley, Marianna, Chattahoochee, Quincy, by or near Havana, Tallahassee, Monticello, Greenville, Madison, Live Oak, Lake City, Sanderson, MacClenny and Baldwin."

State Road No. 10 was described as follows: "Road No. 10. Extending from the Georgia State Line near Beachton to Pensacola, via Tallahassee, Woodville, Newport, and as near St. Marks as practicable, and thence around the coast to Panacea Springs, St. Teresa, Lanark, also via Wakulla, Crawfordville, Sopchoppy, Carrabelle, Apalachicola, Fort St. Joe, Panama City, near mouth of Choctawhatchie River, Freeport, Portland, New Valparaiso, Camp Walton, and thence into State Road No. 1 at or near Milton and thence over State Road No. 1 connecting with Pensacola."

State Road No. 19 was designated as follows: "Road

No. 19. Extending from Tallahassee to Ocala, leaving out of Tallahassee on the St. Augustine Road, thence to or near Chaires via Waukeenah, Capps and Lamont, thence direct to Perry, Cross City, Old Town, Chiefland, Bronson and Williston.''

Also, on June 8, 1925, an Act was adopted (Chapter 10270) designating and establishing as a state road State Road No. 66, as follows: ''Road No. 66, extending from Bristol to Tallahassee, via Telogia, Hosford and Jackson Bluff Bridge.''

The intervenors allege in their answer that they are informed and believe that by this Act the Legislature made a state road of the road referred to in the petition as ''the Jackson Bluff Road from Tallahassee to Ocklocknee River.''

Having shown all the statutory provisions that appear to have any bearing upon the subject of the powers *vel non* of the County Commissioners to call an election for the purpose declared in the resolution, which embraces the issuance of bonds a part of the proceeds of which are to be used in aid of the construction of that part of certain designated state roads located within the county, we recur to the fundamental question,—is this a ''county purpose'' within the meaning of the constitution?

Although benefits of a state road passing through or terminating in a county may extend to the citizens of other counties, and may even be state-wide to some extent, it would appear that ordinarily the people primarily and most largely benefited by that portion of such state road located in any particular county are the people of such county. It adds to their transportation facilities, facilitates access to the markets for their products, makes more convenient their access to other counties and places situated on said road or towards which it leads, for purposes of

travel either for business or pleasure, and tends to increase
the amount of travel into and through the county from
other sections of the state and nation; and therefore tends
to increase the number of inhabitants and the values of the
lands of the county, either as a whole or of some consider-
able portion of the county served by such road. That such
are ordinarily the tendencies and effects of the construc-
tion of paved or hard-surfaced highways is a matter of
common knowledge of which the courts may well take judi-
cial knowledge. At least, it is the duty of this court to
indulge the presumption in the absence of a contrary show-
ing that some such considerations form the grounds or mo-
tives of the action taken by the County Commissiners.
Whether the road be called a state road or a county road,
it is open to the use of the general public, both of the county
and the state, and its benefits flow to both the county and
the state. It may be a state road, both in name and in
ownership, but as to that portion which passes through a
particular county, it is also, to all intents and purposes and
in its beneficent effect, a county road as well. In substance
and effect, such through or trunk-line highways are not
exclusively state highways. They would generally minister
to the benefit of both state and county. Whether the
county or the state constructs or owns or maintains any
given portion of a through highway, connecting neighbor-
hoods, villages and towns within the county, as well as
counties and cities beyond its boundaries, and facilitating
travel, transport and intercommunication between them,
the use is the *same,* and the *benefits are the same..* And
that use is not, and never has been, confined to citizens or
residents of the particular county, but is open to the gen-
eral public, to all travelers no matter from whence they
come. Even in the days, not so far distant, when the loca-
tion, construction and maintenance of roads was left by the

Legislature entirely to the counties—when all roads were primarily county roads,—there was nearly always the effort, unco-ordinated and frequently unsatisfactory, to so locate them as to afford communication with nearby towns and cities in other counties and sometimes with a view to reaching large centers of population some distance removed, and *the county roads were thus, in effect, state roads also—the only roads the state had,* and *the plenary power of the State Legislature over them was ever present and never relinquished.* So when we look to the *substance* rather than the *form,* the *actual facts* rather than the *names* applied, it appears that the so called ''county roads,'' which the counties have been building and maintaining all these years at county expense, were also in a very real sense state roads as well. Now, since the state has by statute designated certain roads as state roads, and provided that when located and constructed between the points named in the statute, they shall become the property of the state, and be maintained by the state, does this change in nomenclature or title and maintenance in any way interfere with the public use or detract from the beneficial results of such a public utility to the county where located? Certainly not; especially when the state road is equal or superior in quality *and follows substantially the same route that the county road did.* And when it appears that such a state road when located and constructed does not follow all the curves and windings of the former county road, but runs in a practically straight line between the towns named in the statute, thus shortening the route between the same towns as compared with the former county road, it would appear that ordinarily and in the long run this would increase rather than decrease the benefits of the road to the people of the county through which it passed—that is, the people of the county as a whole. Though in such event the

straightening of the road might cause great inconvenience to those individuals whose property would no longer adjoin the main highway, such incidental subtraction of benefits as regards a comparatively few individuals is usually the inevitable result of changing the route of any road, no matter how imperative the need for such a change may be for the good of the county as a whole.

It would also appear that if the Legislature has the power, which it undoubtedly has, to confer, as it has long done, on the county the power to build and maintain public roads for the use of the general public, no matter from what part of the state they come, it has the power to give them the right, as it has done by the act above referred to (Chapter 8553 of the Laws of 1921) to contribute to or aid in the construction of a public road in the county to be owned and maintained by the state thus legislatively determining such purpose to be a county purpose. (See the Stuart case, 71 Fla., pp. 180, 181 supra.) Such an act could be constitutionally operative and applicable, unless perhaps in some exceptional case where it was shown that such road actually conferred no benefit, either present or potential, upon the county through which it was constructed or in which it was located. This does not render the statute unconstitutional, but imposes the duty to enforce it when it may be legally applied. Burr v. F. E. C. Ry. Co., 77 Fla. 259, 81 So. 464; Seizure of 7 Barrels of Wine, 79 Fla. 1, 83 So. 627; F. E. C. Ry. Co. v. State, 79 Fla. 66, 83 So. 708. But the legislative construction of the constitution to the effect that county aid to state road construction in the county constitutes a county purpose, is entitled to such weight as to require allegation and proof, showing the contrary to overturn or prevent the applicability of the statute in any given case. In this connection, it will be observed that there is nothing compulsory about the act referred to. While the Legislature has

designated the system of state roads, and authorized the county to contribute to the construction of any portion thereof within the county, it is left entirely with the Board of County Commissioners of the several counties to determine, subject to ratification by the voters, whether the power to extend such aid shall be exercised.

We are not without authority in support of the views above expressed. In the case of Cotten v. County Commissioners of Leon County, 6 Fla. 610, it was held that the issuance of bonds in exchange for stock of a railroad proposed to be constructed into or through the County of Leon, authorized by act of the Legislature, constituted a county purpose and not in contravention of a provision of the constitution, then in effect, similar to that of the present constitution. In a very able, unhurried and thorough-going treatment of the subject, this court, speaking through JUSTICE DUPONT, held that no certain rule can be prescribed by which to determine when a work of internal improvement shall be deemed to be embraced within the meaning of the phrase, "county purpose," as used in the constitution, and that neither the locality of the work within the county nor the anticipated benefit to be derived from it by the county, is of itself a certain test, but that, if furnishing a general rule, the concurrence of the two would seem to be required.

In the case of Skinner v. Henderson, 26 Fla. 121, it was held that the statute authorizing the city to build bridges within its limits does not necessarily revoke the authority given to the county by general statute, without restriction as to locality, to build a bridge within those limits; and that as there may be bridges serving only a city purpose, so there may be others demanded in the same territory for county purposes; and that where the circumstances create this demand, and the bridge is for the benefit of the people

of the county at large, or of some considerable portion of them, and intended and needed as well for those outside as for those inside the city, the authority of the county to build is not annulled by said local city statute. It was also held that if a county may build a bridge within the limits of a municipality when the circumstances suit, it may also aid the municipality in building one under like circumstances, even though it is to be constructed under a contract with the municipality and is to be under its control. In Stockton v. Powell, 29 Fla. 1, this court held that the deepening of the channel of St. Johns river within the limits of Duval County, although the river passes through other counties and is an instrument of commerce with other states and counties, was a county purpose for which Duval County could issue its bonds under the authority granted by the Legislature without violating the constitution. See especially that part of the very able opinion of CHIEF JUSTICE RANEY appearing on pages 27 and 42. In the case of County. Commissioners of Escambia County v. Board of Pilot Commissioners, 52 Fla. 197, 42 So. 697, it was held, that the expense of protecting the bay or port of Pensacola, which lies both in Escambia and Santa Rosa Counties, and, under the police protection of the City of Pensacola, to prevent the filling in of the waters used for navigation and commerce, was a county purpose. In the able opinion of MR. JUSTICE WHITFIELD, it was said: "A river, harbor, or bay of a port is a public highway, useful to the people of the county in which it is situated for the purposes of navigation and commerce. The depth of the water therein is one of the chief elements of its value, and its protection from injury of being filled in, is within the purpose for which county governments are established, even though the harbor or bay be also and largely used for passage to and from, and commerce with, points beyond

the county. It is competent for the State acting through the counties to protect the ports, harbors, bays and rivers therein if the control of the general government within its sphere is not thereby interfered with.''

In Rushton v. State, 75 Fla. 424, 78 So. 345, it was held that the state troops, aiding a county at the request of its authorities in enforcing law and order in the county, constituted a county purpose.

In Jordan v. Duval County, 68 Fla. 48, 66 So. 298, it was held that an act authorizing the County of Duval to issue bonds and to levy taxes to pay for erecting and equipping an armory, to be used in whole or in part for the state militia in the county upon such terms and conditions and with such limitations or reservations of the use of the armory as might by the County Commissioners be determined to be for the best interest of the county, did not appear beyond all reasonable doubt to be a violation of the constitutional provision limiting county taxation to county purposes; that the legislature in exercising. its appropriate. law-making functions, may determine what is a county purpose and the courts are not authorized to render such determination ineffectual unless some provision of the constitution is violated, or unless the particular enactment can have no practical or legal relations whatever to any county purpose. In Duval County v. Jacksonville, 36 Fla. 196, 18 So. 339, it was held that the legislature exercises plenary control over highways, whether they be county roads or streets in cities and towns, and that the statute directing County Commissioners to pay over to city authorities, for use in laying out, improving and repairing streets, a part of the revenue raised by the county for public roads, did not violate the constitutional provision here in question. To the same effect, see Hillsboough County v. State, 57 Fla. 50, 48 So. 976; Dade County v. Miami, 77 Fla. 786, 82 So.

354; Stewart v. DeLand Road & Bridge District, 71 Fla. 158, 181; 71 So. 42.

It was suggested by appellants upon the oral argument that Chapter 8553 of the Laws of 1921 was violative of Section 16 of Article III of the constitution. A careful examination of the title and subject matter embraced in this act convinces us that this point is not well taken. The amplification of the title to an act so as to make it expressly mention matters germane to and properly connected with its general subject does not vitiate such title or subject it to the criticism of expressing more than one subject. See State v. Bryan, 50 Fla. 293, 39 So. 929; F. E. C. Ry. Co. v. Hazel, 43 Fla. 263, 31 So. 272; and Stewart v. Special Road and Bridge Dist., 71 Fla. 158, 71 So. 42, and cases cited.

For the reasons above pointed out, we are clearly of the opinion that the County of Leon, acting through its Board of County Commissioners, had the power to adopt said resolution of March 16, 1925, and to take the other steps necessary under sections 1531-6 of the Rev. Gen. Statutes of 1920, to authorize the issuance of said bonds for the purpose expressed in the resolution, though some of the roads of the county designated in the proceedings to be constructed, or the construction of which is to be aided, are also State roads, within the designation of the statutes referred to and that such purpose is a county purpose within the meaning of section 5 of Article IX of the constitution.

II. Several of the paragraphs of the answer of the intervenors object to the validation of the bonds because of alleged changes in the route of the state roads, the failure to follow in the line of the existing county roads, the failure to establish the various county roads to be constructed and to secure the rights-of-way, in advance of taking action for authorizing the bond issue.

As to State Road No. 1, which is described in the resolu-

tion calling the election, as, "State Road No. 1, through the County of Leon from the Jefferson County line to the Gadsden County line," the answer alleges that at the time of calling the election, and at the time of holding the election on May 5, 1925, State Road No. 1 was designated by statute as running from Monticello via Lloyd, Capitola, and Chaires to Tallahassee, and thence from Tallahassee via Havana to the City of Quincy and that the State Road Department has ignored the designation of said road as between Tallahassee and the City of Quincy, has never acquired any right-of-way from Tallahassee west towards the City of Quincy, nor has it surveyed the right-of-way between those points. The answer is manifestly in error in alleging that State Road No. 1 was designated by statute as between Monticello and Tallahassee so as to run through Lloyd, Capitola and Chaires. See the quotation from Chapter 9311 of the Laws of 1923 hereinabove quoted, which shows merely that State Road No. 1, as fixed by that statute, passed through Quincy, Havana, Tallahassee, Monticello, and the other points mentioned. The amendment of June 1, 1925, Chapter 10269, hereinabove quoted, changes it to read, "by or near Havana," which town is in Gadsden county and this change would not necessarily affect the route of said road through Leon County to any substantial extent. However, this amendment was made after the proceedings for the issuance of the bonds had been completed and could not be held to affect the validity of the proceedings. It is further alleged that at the time the election was called that part of State Road No. 1 between Tallahassee and Monticello within the County of Leon was generally known and considered to be the St. Augustine Road, through Chaires, Capitola and Lloyd, whereas the State Road Department, prior to the calling of the election, had located as State Road No. 1 an entirely different route

between Tallahassee and Monticello, which did not touch either Chaires or Capitola, but runs to the northward of said points and does not follow any of the public roads of Leon County except where the route as located and graded crosses or laps one of the old county roads within Leon County; nor had the state or county acquired a full and complete right-of-way for said road. In the argument in behalf of the appellants, it was stated that the route adopted ran practically in a straight line from Tallahassee to Monticello, crossing the south end of Lake Miccosukee. The geography of this section shows that the adoption of this route by the State Road Department materially shortened the distance between Tallahassee and Monticello.

As to State Road No. 10, it is alleged that prior to the calling of the election the southern end of this road between Woodville and the southern boundary of the county had been taken over by the State Road Department and a hard-surfaced road constructed, and that the department had begun the construction of that part between the City of Tallahassee and the northern boundary of the county, had surveyed the right-of-way and cleared it and graded it to some extent, but that practically no part thereof from Tallahassee northward was extended along the county road theretofore existing; but a new right-of-way had been located, part of it cleared and graded, which touches only the county road where it so curves as to cross over or lap the projection of the state road, which follows a general straight line; that no work has been begun on Road No. 10 between Tallahassee and Woodville, but when the work is begun it will be laid out and constructed independently of the present county road in the same manner as was done north of Tallahassee; that at the time of calling the election the State Road Department had not acquired title to the right-of-way for Road No. 10 northward from Talla-

hassee, nor had the route of said road from Tallahassee to Woodville been definitely located and determined.

That as to State Road No. 19, it had not at the time of the calling of said election or at the time of the election been surveyed or located by the State Road Department; that at the time of calling and holding the election for bonds, the statute designated Road No. 19 as, "extending from State Road No. 1, east of Tallahassee to Williston, via Perry, Cross City and Bronson," whereas thereafter the Legislature changed the route entirely. See quotation from Chapter 10269, approved June 1, 1925, which shows that the route of this road was changed so as to lead out of Tallahassee on the St. Augustine road, thence to or near Chaires, via Waukeenah, Capps and Lamont, thence direct to Perry, Cross City, Old Town, Chiefland and Bronson, to Williston and Ocala. It will be observed that this statutory change still leaves the road running east from Tallahassee to "Williston via Perry, Cross City and Bronson;" hence no radical change is affected, and the allegation that the route had been changed entirely in inaccurate. It will also be recalled that in the resolution of March 16th this road is referred to as follows: "State Road No. 19 as now designated, or other road from the eastern limit of the City of Tallahassee, to the Jefferson County line in the direction of Williston, or some point south of Williston on State Road No. 5." It does not thus appear that there has been any departure from the route indicated in the resolution.

That as to the Jackson Bluff road running from Tallahassee westerly to the Ocklocknee River, no right-of-way has been secured by either the state or the county, nor has the road been established according ot law, and that no such road was in legal existence at the time of calling the election; that intervenors are informed and believe, and so allege, that this road was made a state road at the 1925

session of the Legislature. The petition refers to this road as "the Jackson Bluff Road from Tallahassee to Ocklocknee River." There was an act approved June 8, 1925, Chapter 10270, designating as a state road the following: "Road No. 66, extending from Bristol to Tallahassee, via Telogia, Hosford, and Jackson Bluff bridge." This is probably the act referred to, but whether this is the same road referred to in the petition calling the election is not made to appear by the record otherwise than by this allegation in the answer. Accepting the allegation as true, it would appear that after the bond proceedings had been put through, which provided for the "Jackson Bluff Road from Tallahassee to Ocklocknee River," which is treated in the petition as a county road, this road was adopted by the Legislature as a state road.

That as to the five other roads mentioned in the petition and treated therein as county roads, the answer alleges that none of them are completed projects, that the right-of-way therefor is not owned by the county or the state, and that these roads had not been established according to law and had no legal existence at the time of the resolution calling the election or at the time of the election.

This sums up the specific objections raised by the intervenors respecting the various roads and we will now consider their sufficiency.

The statute under which these proceedings were taken, Section 1531 of the Revised General Statutes, provides that whenever the Board of County Commissioners of any county shall deem it expedient, or to the best interest of such county to issue the county bonds of their county *for the purpose of constructing paved, macadamized, or other hard-surfaced highways* they shall determine by resolution to be entered in their records the amount of bonds required for such purpose, the rate of interest to be paid thereon

and the time when the principal and interest of such bonds shall be due and when payable. The statute does not require the exact location of the roads to be set out, nor that the right-of-way shall have been secured in advance.

The Act of 1921 hereinabove referred to gives authority to the county to *aid in the construction of any state road* by contribution to the State Road Department of cash, bonds, etc.

The authority exercised by the Board of County Commissioners in this case, as shown by their resolution, is to issue bonds of the county in the sum of $1,500,000.00 for the purpose of constructing and aiding in the construction of paved, macadamized, or other hard-surfaced highways.

The object to be accomplished by issuing the bonds is the construction of highways of the character designated in the statute and the resolution. This embraces everything necessary to accomplish the end in view, from surveying and locating the route and securing the right-of-way to grading the road-way and hard-surfacing the same.

The resolution provided that the proceeds of the sale of the bonds "shall be apportioned to and expended on the several paved, macadamized, or other hard-surfaced roads to be constructed, or the construction of which is to be aided, by the issue and sale of said bonds, as follows, to-wit:" Then follows a designation of the roads with the amount apportioned to each, as set forth in the beginning of this opinion, in such language as to indicate in a general way the roads to be aided or constructed.

There is nothing in the resolution or in the statutes upon which it is founded, which confines the construction of state roads to the lines of existing county roads as a condition precedent to having county aid in their construction with a part of the proposed bond issue. Nor is there anything in the resolution or in the statute which required that the

State shall have acquired the right-of-way before the issuance of bonds is authorized. Nor is there anything in the resolution, or in the statutes, which requires the county to confine its construction to the exact existing route of the roads enumerated. It would appear that the matter of acquiring the right-of-way for any portion of the route as a condition precedent to the construction of the road, either state or county, at a particular place, would be a question between the authorities and the landowners; and both the state and the county have the power of eminent domain which may be exercised in case no agreement can be reached.

Furthermore, at the time the resolution was adopted and the election held, the general route of the state roads mentioned in the resolution had been indicated by the Legislature by statute naming the principal towns along said route, and the law vested the State Road Department with the power of surveying and fixing the exact location of the route between such named points, and to secure the right-of-way therefor. Both the County Commissiners and the voters of the county knew, or are presumed to have known, these provisions of law. Also, the County Commissioners were vested by law with the power to lay out the route and location of the county roads and to secure right-of-way therefor.

This situation cannot be invoked as a legal reason why the bonds which have been legally authorized for constructing a highway or aiding in its construction should not be validated. The mere fact that a part of the proceeds of the bonds might be required to secure the right-of-way necessary for the construction of the proposed road or roads is incidental to the main purpose and hence affords no reason why the bonds should not be validated.

Nor can it be supposed that the State Road Department

or the Board of County Commissioners in the construction of such costly highways as the mdern hard-surfaced roads, and which are to accommodate a traffic of a largely different character from that in use when some of the indicated highways were first laid out as public roads, are required to follow the curves and windings and adopt the grades of the existing county roads. The designation in the resolution is for the purpose of indicating in a general way the line of construction and the territory to be served by the proposed highways.

The intervenors do not show as their ground of objection to the alleged change of route that they live or own property on any of the highways the route of which is alleged to have been changed, or that, if the change is permitted, either of them will suffer injury of a kind different from the general public.

The objections as here made to the change of route, or failure to secure right-of-way in advance, or that it does not appear by the record that some particular road named in the list of those where hard-surfaced highways are to be constructed, had been established according to law, does not under the statute impair the power to issue the bonds, nor does it show such a substantial departure from the purpose of the resolution as to defeat its object, and therefore these grounds present no valid reason for refusing to validate the bonds. If it should develop that there has been any radical departure from the route of any of the roads named in the resolution and after its adoption, or after the election, for the issuance of the bonds, this might present a question going to the expenditure of the funds raised by the sale of the bonds, for relief against which appropriate remedies are provided by law. But it is not shown by the answer of the intervenors in this case that up to the time of the adoption of the resolution or the election authorizing

the issuance of the bonds, that there had been any depart-
ure from the routes as indicated by the resolution of the
Board of County Commissioners or by the Acts of the
Legislature.

In support of its contention· in this regard, appellants
cite the cases of Thomson, et als. v. Town of Frost Proof,
— Fla. —, 103 So. 118, and City of Palmetto v. Katsch, 86
Fla. 506, 98 So. 352. These cases involve municipalities.
In the first case, the contestants set up that no street had
been established that the town was authorized to improve,
and that the property that would be specially assessed for
such improvement would not be property abutting on a
street, and hence no lien could be declared against it for
any part of the cost of construction; that no streets had
been designated where the proposed paving was to be done,
and that there were no such streets in the town as some of
those proposed to be paved. In the second case, the defend-
ant, in a suit by the City of Palmetto to foreclose a lien
against his property, was defending on the ground that no
street existed at the time the improvement was made and
hence that there could be no valid lien against his property
as abutting on the street. Both cases were based on the
lack of power in the municipality to make an assessment
against property owners owning property claimed to abut
on a street which had no legal existence. In this case,
there is no claim that any of the cost of the proposed road
construction is to be assessed against property abutting the
right-of-way of the roads proposed to be constructed. In
this suit the intervenors make no effort to show any special
injury to them, different from that of the general public,
by reason of any alleged change of route. They base their
right to intervene and interpose their objections upon the
fact that they are citizens and taxpayers, and they are
therefore not in position to raise any objection other than

one in which the general public of the county, or at least its citizens and taxpayers, have a common interest. The fact that a particular route might meet with the approval of the intervenors might not prevent such route from being more satisfactory to a much larger number of taxpayers. Therefore, in order for any change of route to be invoked to defeat validation, it should be such as to defeat the purpose expressed in the resolution and ratified by a large majority of the qualified electors at the election held thereunder.

If the resolution in this case had attempted to fix and delineate the exact route and location of the lines of the various roads, and then, after an election held authorizing bonds for such specifically designated routes, any radical change had been or should be made from such designated routes this would, under the case of Whitner, et als. v. Woodruff, et als., 68 Fla. 464, 67 So. 110, afford good grounds to enjoin the expenditure of the public funds so raised. In the case cited, an injunction was sought by Whitner and others against Woodruff and others, County Commissioners, and the Trustees of a specific road and bridge district, and the parties who had been awarded the contract to build certain roads, to enjoin a change of route from a designated street within the City of Sanford to a different street three blocks distant, and also against reducing the width of said road as authorized, and to prevent the contractors from proceeding with the construction of such road. In that case, it is said: ''While the citizens might, if requested, have such confidence in their officials as to give them power in general terms, yet when the request is for specifically limited power, those officials must keep within its limits. If the County Commissioners obtain the consent of the people by a vote to pave at public expense a designated road or street, those owning property

fronting upon that road or street may justly complain if the officials undertake to pave not that street, but another parallel street three blocks distant.''. The complainants in that case were not only resident taxpayers, but owned property on the street from which it was proposed to divert the paving which had been authorized to a different street. The proposed reduction in the width of the road affected all citizens and residents of the county alike to some extent. Hence the court held that whether as taxpayers seeking to prevent the unauthorized expenditure of money or as abutting owners peculiarly interested in the diversion of the proposed route, the complainants had a standing in a court of equity.

As above pointed out the facts with reference to the location of the roads in this case are not similar to those in the cited case, because only the general route of the roads to be constructed, or the construction of which is to be aided, is indicated in the proceedings upon which the authority to issue the bonds is based. But, as above pointed out, if it has developed since the election on the bonds, or should develop in the future, that any radical departure from the route indicated in the resolution should be adopted, this would present a question going to the expenditure of the funds, rather than the validity of the bond issue.

III. Appellants further contend that the bonds could not be validated because the question was submitted at the election as a single one and the voters of the county were deprived of the right of exercising any choice as to the issuance of bonds for any one or more of the several roads set forth in the call, but were confined to the single question of whether the total amount of bonds should be issued or none at all.

In behalf of the appellee, on the other hand, it is con-

tended that the question submitted to the voters at said election was a single one, that is to say, whether a bond issue of $1,500,000.00 should be authorized for the purpose of constructing and aiding in the construction of hard-surfaced highways in said county, the net proceeds derived from the sale of the bonds to be apportioned and expended on the several hard-surfaced roads to be constructed, or the construction of which is to be aided, by the the issue and sale of said bonds, the roads so to be constructed, or the construction of which is to be aided, then being enumerated, and the sum intended approximately to be allocated to each being named; that this constituted a single, comprehensive plan of hard-surfaced road construction throughout the county, intended to subserve the interest of each section and following in a general way the route of roads which had been used for more than half a century. It is further contended in behalf of appellee that there was no right in the voter, legal or otherwise, to require that the question be divided so as to allow the electors to vote on each road separately; that if such a plan had been pursued it would have enabled the voters in populous sections of the county to have secured roads in which they were specially interested, and to defeat the bonds proposed to be issued for roads in the sparsely settled parts of the county; that aside from the question of legal rights, it would have been a bad policy to have submitted each road proposed to be constructed as a separate project.

In the case of Potter v. Lainhart, 44 Fla. 657, 30 So. 251, it was held by this court that under this same statute the County Commissioners had the authority to submit to the voters as a single question whether a bond issue of $150,000.00 should be authorized, $50,000.00 of which was for the erection of a court house and jail and $100,000.00 of which was to be applied to the construction of hard-sur-

faced roads. The court says: "Whether the Commissioners had the authority to make the submission as they did depends upon the statute under which they acted, Section 591, Revised Statutes, as amended by Chapter 4711, and Section 583 of the Revised Statutes, supra. In the opinion of a majority of the court the Commissioners had the right, under the authority conferred, to submit the question to the voters as was done, and that a majority vote in favor of the entire issue of $150,000.00 of bonds would authorize the issuance."

In the case of Perry v. Town of Panama City, 67 Fla. 285, 65 So. 6, there was involved an issuance of bonds, the only designation of the purpose for which they were issued in any of the proceedings being merely the words "for municipal purposes." Sections 1061 and 1062 of the General Statutes of 1906 gave the City Council power, with the approval of two-thirds of the registered and qualified voters of the city, actually voting, to issue bonds whenever it may be necessary for the purpose of building or repairing the public works of the city, and other named purposes, or any other municipal purpose." The court, speaking through MR. JUSTICE WHITFIELD, used the following language: "There is no statutory requirement that the particular or specific municipal purpose for which the proceeds of the bonds are to be used, shall be designated or mentioned in the ordinance providing for the issuance of said bonds, or in any proceedings relating thereto. The forms and proceedings to be observed in the submission of the question of issuing the bonds to the electors are to be 'in such manner and after such public notice as may be deemed necessary by the City Council. Municipal bonds can lawfully be issued only for municipal purposes; and when a proposed issue of bonds appears to be for a 'municipal purpose,' the statute does not require

the proceedings taken by the municipality or by the proper electorate preliminary to the issue of the bonds, to designate the particular municipal purpose for which they are intended to be used. It does not appear that the City Council by any appropriate action taken required the particular municipal purpose for which the bonds are to be used to be stated in any of the proceedings taken by the city or the electors. Where a municipality is duly authorized to exercise a particular municipal function and the manner of the exercise of the authority is not defined by statute, but is left to the City Council, the courts will not undertake to control the manner of the exercise of the authority by the City Council where no applicable rule of law is violated, and the authority given is not exceeded or abused.''

In the case of Merrell v. City of St. Petersburg, 74 Fla. 194, 76 So. 699, an intervenor sought to prevent the validation of an issue of city bonds, among other things, because one of the provisions appearing on the ballot provided that $133,000.00 was for several different projects. It appeared, however, that all of these needs related to or were a part of one project, namely, the completion of the waterfront scheme of the city. The charter provided that elections held for the purpose of ratifying bond issues were to be held ''in such a manner as may be provided by the Board of Commissioners.'' Citing the case of Perry v. Panama City, supra, the Court held that it would not undertake to control the manner of the exercise of the authority conferred on the City Council when no applicable rule of law was violated and the authority conferred on the City Council was not exceeded or abused, and that, therefore, the point above mentioned was not well taken. In the case of Antunno v. Tampa, 87 Fla. 82, — So. —, five totally unrelated projects were submitted to the electors of the city as

a single proposition, and this was properly held to be erroneous, but that case is not in point here.

We therefore conclude that under the statute, Section 1531, Revised General Statutes, discretion is vested in the County Commissioners to determine that it is expedient and to the best interest of the county to issue bonds for constructing hard-surfaced highways, subject, of course, to the ratification of the voters at the election called under a succeeding section, and that they are not required by either of these sections to submit to the voter separately the roads that shall be constructed or the amount of bonds that is to be allotted to each highway, and that the contention of the appellants in regard to this matter was properly disallowed by the court below.

IV. Appellants contend that the Board of County Commissioners abused the authority vested in them by law by deciding to issue bonds to an unreasonable amount in view of the assessed value of the entire property in the county and the existing indebtedness of the county, and the amount of taxes for state, county, school district, and municipal purposes. While the discretion vested in the County Commissioners is subject to control by the courts in case of its abuse, without going into detail, we deem it sufficient to say that the showing made by the appellants under this head is not sufficient to justify this court in declaring void the action of the County Commissioners. A much stronger showing was made by the intervenors in the case of Getzen et al. v. Sumter County, 103 So. 104. In that case, it was said by this court, speaking through MR. JUSTICE WHITFIELD, that, ''In reviewing administrative discretion of officials, the court should give consideration to the matters that were or should have been considered by the officials in exercising the discretionary authority that is being reviewed. In exercising their authority to determine

by resolution the amount of bonds required for the authorized purpose, the County Commissioners doubtless consider all matters that were pertinent to the decision. Among such matters are the pressing needs of the county for hard-surfaced roads,'' etc. A little further on, the opinion continues: ''As the law prescribes no definite limit to the amount of bonds a county may issue, and as the needs and demands of the people of the county and of the conditions and circumstances, and the reasonable anticipation based on facts and apearances and not on mere conjecture (K. C. Ry. v. Road District, 45 S. C. 136, 69 Law Ed. —) that should have guided the County Commissioners in determining the amount of bonds that it is expedient or to the best interest of the county to issue for the designated purposes, may reasonably justify the proposed bond issue, it is, on the showing made as to the abuse of discretion by the County Commissioners, not clear to this court, as against the decree of the resident Circuit Judge, that the County Commissioners committed an abuse of authority and discretion in fixing the amount of this bond issue which has been approved by a majority of the freeholder electors of the county.''

Many of the matters which enter into the consideration of County Commissioners in the exercise of their discretion in this regard are peculiarly within their knowledge, and the agreement of the majority of the legal voters of the county, as expressed by their ballots, to the amount of the proposed bond issue, while not conclusive, is strongly persuasive that the discretion of the County Commissioners was not abused. And the figures offered by the intervenors in this case do not show such abuse of their discretion on the part of the County Commissioners as would warrant this court in annulling their action. We consider the Getzen case, supra, as conclusive on this point.

V. Under the fifth assignment of error, appellants contend that the court was not authorized by the statute to state in its decree, as it did do at the conclusion thereof, the following: "And this decree shall be forever conclusive upon the validity of the said bonds against the said county, and the validity thereof shall never be called. in question in any court in this state." As this was a mere statement of the effect of the validation as decreed by the statute, and in the language of the statute, it cannot be complained of.

The court has given a careful consideration to the important questions presented and has been greatly aided therein by the well prepared briefs and able arguments of distinguished counsel for the respective parties. The above views dispose of all of the principles underlying the various objections made in the answer and demurrer interposed by appellants to the petition for the validation of said bonds and lead to the conclusion that neither said objections nor the demurrer was well founded, and that the court below was without error in overruling the demurrer and in granting appellee's motion to strike the answer. Therefore the decree of the court below should be affirmed.

Final decree affirmed.

TERRELL, STRUM AND BUFORD, J. J., concur.

WHITFIELD AND ELLIS, J. J., dissent.

WHITFIELD, J., dissenting.—The county bonds validated by the Circuit Judge in this statutory proceeding, are for the purpose of aiding in the construction of certain State Roads in the county and of constructing certain county roads. The bonds are sought to be issued pursuant to Sections 1531 *et seq.* Art. 3, Division 1, Title 9, Revised Gen-

eral Statutes of 1920, supplemented by Chapter 8553 Acts of 1921. Section 1531 authorizes the county commissioners by due procedure and upon an approving vote of the appropriate electors of the county (see Chapter 9294, Acts of 1923) to issue county bonds for the purpose of constructing paved, macadamized or other hard surfaced highways, and Section 1543 authorizes an annual county tax to pay the interest and principal of bonds issued under *that Article* of the Revised General Statutes. Chapter 8553, Acts of 1921, authorizes any county to aid in the construction or maintenance of any State or State Aid Road, by contributions to the State Road Department of cash, bonds, time warrants, or other things of value in the construction or maintenance of roads, including contributions of ''county road bonds which have been, or which shall hereafter be voted of the people of the county.''

On appeal it is contended that the bonds proposed to be issued in this case involving county taxation to aid in the construction of designated State Roads in the county, are invalid upon the ground, among others, that State Roads are State property used for a State purpose, and the constitution forbids a county to levy taxes for other than a county purpose.

Section 1531 of the Revised General Statutes of 1920, clearly authorizes county road bonds to be issued by the county and does not in terms authorize county bonds to be issued to aid in the construction of State roads; and Section 1543 authorizes a tax levy to pay the bonds that are issued under Section 1531, Revised General Statutes of 1920, and does not authorize a tax to pay bonds that Chapter 8553 purports to authorize to be donated for constructing State roads. Chapter 8553, Acts of 1921, is permissive as to donating and does not make provision for issuing bonds, nor does it authorize a tax levy. Even if by inter-

pretation or otherwise the cited statutes purpose to authorize a county bond issue and tax levy to aid in the construction of State roads, the legislation is ineffectual because by the terms of the statutes establishing a system of State Roads of this State, extending throughout the State, a State Road is the property of the State, constructed independently of the county system of public roads and without reference to county lines, with State funds under State authority to the exclusion of county authority, which considerations make the State Roads a State function, expense and purpose, and not a county function, expense or purpose; therefore county bonds to aid in constructing State Roads are for a State purpose and not for a county purpose; and as such bonds involve county taxation they violate Article IX of the Constitution which commands that the legislature shall provide (1) for a uniform and equal rate of taxation for State purposes, Sec. 1; (2) for raising revenue sufficient to defray the expenses of the State for each fiscal year, Sec. 2; and provides (3) that no tax shall be levied except in pursuance of law, Sec. 3; and (4) that the legislature shall authorize the several counties to levy and impose taxes for county purposes and for no other purposes, Sec. 5.

The history of the Florida legislation relative to public roads shows the early establishment of a county system of roads which still continues, and also shows the establishment of "a system of State Roads of this State," which are "the property of the State."

Pursuant to the Treaty by which Spain ceded to the United States all the territories known by the name of East and West Florida, which Treaty was ratified and proclaimed at Washington, D. C., on February 22, 1821, the Spanish governmental authority in "the Provinces of the Floridas" "ceased, and that of the United States of Amer-

ica was established over the same'' by Proclamation issued at Pensacola, July 17, 1821, ''by Major General Andrew Jackson, Governor of the Provinces of the Floridas,'' by virtue of authority of James Monroe, President of the United States, evidenced by a commission dated March 10, 1821, the Province of East Florida having on July 10, 1821, at St. Augustine been delivered ''to the government of the United States,'' through Colonel Robert Butler, Adjutant General representing the United States.

By an Act of Congress approved March 30, 1822, ''all that territory ceded by Spain to the United States, known by the name of East and West Florida'' was constituted a Territory of the United States under the name of the Territory of Florida, and a system of government for such territory was promulgated.

By a Territorial Act approved August 23, 1822, the City of Pensacola was incorporated and given ''full power and authority to keep in repair all public roads leading to the city for the extent of three miles therefrom.''

A Territorial Act approved September 13, 1822, incorporated the City of St. Augustine, and gave to that city ''all the rights, privileges, powers and immunities granted to and conferred upon the corporation of the City of Pensacola,'' the title of each Act being to incorporate the city ''and improve the public roads in the neighborhood thereof.''

A Territorial Act establishing County Courts composed of Justices of the Peace, approved September 13, 1822, provided that ''the said court shall and may take cognizance of all matters and things relating to the opening and keeping in repair of roads within their counties.'' Another Territorial Act ''concerning roads, highways and ferries,'' approved September 13, 1822, provided that ''all the roads in the several counties in this Territory that have been laid

out by order of any court according to law, shall be and they are hereby respectively declared to be public roads" and that all resident able-bodied male persons between given ages "shall be subject to work on the public roads and highways in such county." Sec. 1598, Rev. Gen. Stats. 1920. See Butler v. Perry, 67 Fla. 405, 66 South. Rep. 150; Butler v. Perry, 240 U. S. 328, 36 Sup. Ct. Rep. 258; Marshburn v. State, 65 Fla. 470, 62 South. Rep. 586. An Act of Congress approved February 28, 1824, authorized $20,000 to be spent in making "a public road from Pensacola to St. Augustine," and later Acts made small appropriations for maintaining such road during the Territorial days. Florida was admitted into the Union by Act of Congress approved March 3, 1845, and the State government took control in June, 1845. Chapter 53 Laws of Florida, approved December 27, 1845, provided for a county system of public roads. See also Chapters 4338 Acts of 1895; Chapter 4769, Acts of 1899; Sec: 1588 *et seq.* Rev. Gen. Stats. of Fla., 1920.

Under various enactments, the county system of maintaining public roads has been observed in the Territory and the State of Florida from 1822 to the present time. See Thompson's Digest, p. 139 *et seq.;* McClellan's Digest, p. 898 *et seq.;* Revised Statutes of Florida, Sec. 626 *et seq.;* General Statutes of Florida, Sec. 835 *et seq.;* Revised General Statutes of Florida, Sec. 1588 *et seq.* Certain statutes authorized tax levies by counties for road purposes. See Chapter 3851 Acts of 1889; Chapter 4014 Acts of 1891, and subsequent Acts. As to issuing county bonds for hard surfacing highways, see Chapter 4711 Acts of 1899; Sec. 1531 *et seq.* Rev. Gen. Stats. 1920. See also Chapter 4887 Acts of 1901, and subsequent tax levy Acts. As to taxes and bonds for roads in special road districts, see Sections 1634-1647 *et seq.* Rev. Gen. Stats. 1920.

Section 7, Chapter 6537, Acts of 1913, now Section 1602 Revised General Statutes of 1920, provides: ''The public roads and bridges of the several counties heretofore established, according to law or by prescription, are hereby declared to be public roads and bridges and under the control and management of the Board of County Commissioners.'' See State *ex rel.* Garrison v. Commissioners of Putnam County, 23 Fla. 632, 3 South. Rep. 164.

By a series of Acts prior to 1919, a State Road Department was established in Florida to advise and assist the counties in maintaining roads. See Secs. 1192 *et seq.* Rev. Gen. Stats. 1920.

Section 6, Chapter 7900, Acts of 1919, Section 1197, Revised General Statutes of 1920, contains a provision that ''the State Road Department may, and is hereby authorized to, locate and designate certain roads in this State as State roads and to construct and maintain the same with funds which are now or which may hereafter become available from the State or from the State and Federal Government, and, provided further, that when such roads are thus located and designated they shall, upon being assumed for maintenance by the State, become the property of the State of Florida, and the State shall have the right to acquire by purchase or otherwise, or by condemnation prior to such construction, the rights of way, or road bed of and for the same, and for that purpose the State Road Department shall have the right of eminent domain, and may condemn the said rights of way or road beds or toll bridges as is now provided by law for securing rights of way or road beds for public roads by Boards of County Commissioners, and the rights of way of all roads or highways laid out or constructed or taken over by the said State Road Department now, or hereafter, the property of any of the counties of this State is hereby declared to be the property

of the State. Provided further, that the State Road Department may, in a similar manner, locate and designate certain other roads in this State to be State Aid Roads, and to construct and maintain the same with funds derived from Federal, State or county sources; all such State and State Aid Roads to be built and maintained under the supervision and control of the State Road Department. The term 'State Aid,' as used in this Act is hereby defined as assistance rendered the respective counties by the State in the construction and maintenance of roads designated by the State Road Department as State Aid Roads, contingent upon the county or counties so aided or assisted providing and furnishing not less than one-half the total cost of the proposed work on such State Aid Roads and bearing not less than one-half of the cost of maintenance thereof.''

Chapter 9311, Acts of 1923, is ''an Act declaring, designating and establishing a system of State roads, providing for the location thereof, and providing that such roads when located and constructed shall become and be the property of the State.''

Section 1 of said Act, Chapter 9311, as amended by Chapters 10269 and 10270, Acts of 1925, designates the ''State roads'' that are to be ''the system of State roads of this State;'' and Section 2, Chapter 9311 provides ''that the above named and numbered roads shall be and constitute the System of State Roads of this State, and when located and constructed by the State Road Department shall become and be the property of the State.''

By Chapters 8411 and 8575, Acts of 1921; Chapters 9120, 9174, Acts of 1923, and Chapters 10025 and 11333 Acts of 1925, funds are provided for building State roads.

It thus appears that by legislative enactments the State now has a definite system of State roads distinct from the

previous and now existing county system, and that such State roads are "the property of the State of Florida." It is obvious that the construction of a State road by State authority as the property of the State, is a State function and purpose as distinguished from a county purpose. The question here is whether in view of express organic provisions, a county can legally issue bonds which require the levy of a tax upon the taxable property in the county to aid in constructing State roads that are constructed by State authority with State funds, without reference to county roads or county lines, such State roads being "the property of the State," and the counties having no authority with reference to such State roads.

The present Constitution of 1885 provides that "The legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purpose, and for no other purposes;" that "the legislature shall provide for a uniform and equal rate of taxation," and that "all property shall be taxed upon the principles established for State taxation." Secs. 1 and 5, Article IX. The provision of the constitution of 1868 is that "the legislature shall authorize the several counties and incorporated towns in the State to impose taxes for county and corporation purposes, and for no other purpose." See Advisory Opinion to Governor, 13 Fla. 687.

The Constitution of 1839 and that of 1865 contained the following provision: "The General Assembly shall have power, to authorize the several counties, and incorporated towns in this State, to impose taxes for county and corporation purposes, respectively." The difference between the provisions of 1839 and 1865 and those of 1868 and 1885 may be material at least when considered with other organic provisions. The organic provision controls legisla-

tion. Lake County v. Rollins, 130 U. S. 662, 9 Sup. Ct. Rep. 651; Cheney v. Jones, 14 Fla. 587.

The provisions of the constitution are not mere verbal formulæ for abstract contemplation; but they are potentially vital organisms, capable of practical application in conferring official powers and securing individual rights, the object being efficient governmental regulations within limitations that are prescribed and designed to be observed for the protection of individual rights. The function of a court is to give effect to the controlling law, which is the constitution, whether State or Federal, in determining litigated controversies arising under legislation or under administrative action. Marbury v. Madison, 1 Cranch (U. S.) 137; State ex rel. West v. Butler, 70 Fla. 102, 69 South. Rep. 771. While the courts will not assume to control the exercise of legislative discretion when exercised within organic limitations, yet if legislation violates the constitution as it affects matters being litigated, it is the duty of the court to so declare when appropriate to a proper decision (State ex rel. Loftin v. McMillan, 55 Fla. 254, 45 South. Rep. 882; Leonard v. Franklin, 84 Fla. 402, 93 South. Rep. 688); and when a conflict between a statutory enactment and the constitution is duly adjudicated, the constitution by its own superior force renders the legislation inoperative. State ex rel. Nuveen v. Greer, 88 Fla. 249, 102 South. Rep. 739.

The constitution specifically provides for a county tax levy for public school purposes (Sec. 8, Art. 12, as amended), for costs and expenses of criminal prosecutions to be paid by the counties (Sec. 9, Art. XVI, as amended), and expressly provides that the counties shall be authorized to "impose taxes for county purposes, and for no other purposes" (Sec. 5, Art. 9), but does not define or indicate what are or may be "county purposes" within the meaning of

the organic provision, though the constitution does require the salaries of county officers to be paid by the counties. Sec. 15, Art. 12, and Secs. 41 and 42, Art. 5. See also Sec. 3, Art. 13, and Art. 15, Const.; State v. Rose, 26 Fla. 117, 7 South. Rep. 370.

While the courts will give due weight to a legislative designation of a county purpose, yet where the execution of the purpose may involve a violation of organic law, the courts will ultimately determine whether it is or is not a permissible county purpose. See City of Bradentown v. State, — Fla. —, 102 South. Rep. 556; Jordan v. Duval County, 68 Fla. 48, 66 South. Rep. 298; 15 C. J. 635.

A statutory designation of a county purpose will be accepted by the courts when express or implied provisions of organic law are not violated, and the designation made has fair relation to the lawful and appropriate objects and functions of a county government. If a particular public duty or function may be allocated to either a State purpose, or a county purpose, and the legislature designates it or undertakes it as a State obligation, object or function, then the express organic provision that county taxes shall not be imposed for other than county purposes, operates to forbid county taxation for the State purpose. Organic limitations upon the taxing power should be given the effect intended by the constitution which is the paramount law. The construction of public roads may be either a State or a county purpose, or the State and a county may have separate and distinct systems of public roads, the county system being confined to the limits of the county, though connecting at the county lines with roads in adjoining counties, while the State system may extend through or into one or more counties to accomplish a definite State purpose in furnishing roads between different points in the State, without regard to

county lines. A State road in a county may be useful to the citizens of that county as a county road may be useful to the public of the State who are privileged to use it, yet the roads or systems of roads may be distinct as a State system and as a county system, the latter being a county purpose and the former a State purpose, for which State purpose the constitution expressly forbids county taxes to be imposed. For more than a hundred years there has been a system of county roads in Florida constructed and maintained by the counties under legislative authority. Now a distinct "system of State roads of this State," has been provided for by statutes, which State roads are "the property of the State," being constructed throughout the State by State funds under State authority without reference to county lines and wholly independent of the county system of public roads, which county system continues as heretofore.

In the taxation Article of the State Constitution, the words "county purpose" are used in contradiction to "State purposes" or "municipal purposes." All relate to public purposes as distinguished from mere private purposes, if not also from mere municipal or other corporate purposes. See Town of Mansfield, State ex rel. v. Police Jury, 47 La. Ann. 1244, 17 South. Rep. 792; Ferguson v. Tyler, 134 Tenn. 25, 183 S. W. Rep. 162; Johns v. Wadsworth, 80 Wash. 352, 141 Pac. Rep. 892; State ex rel. Town of Kirkwood v. County Court of St. Louis County, 142 Mo. 575, 44 S. W. Rep. 734.

Limitations upon the taxing power must be strictly construed in favor of the taxpayer. 1 Cooley on Taxation (4th ed.) Sec. 83, 119.

A county purpose is predicated upon a county function, or county property, or a county right. A State Road is the property of the State, not of a county, and a county has

neither a function nor a right in the construction of a State Road. By the express terms of the statutes a "State Road" is a part of "the system of State roads of this State;" it is "the property of the State," constructed under State authority, with State funds derived from State excise taxes on motor vehicles and gasoline, from State taxation and from Federal appropriations. A State road is no more a county function or purpose than a Federal road would be. A county has no property right in and no authority in the construction of a State road. The use of a State road by the people of the county in which it is located is in common with the public of the State, and such use does not make it a county purpose any more than the use of a county road by the public of the State makes the county road a State purpose. The fact that the public of a county in which a State road is located use the State road in the county more than do the public of other counties, does not change the function and purpose of the road as a State road and does not make the State road a county function or purpose in the county where the road is located. A State road in another county is more used by the public of that county, so the use does not make a county purpose. If a State road is a State function and purpose and is not a county purpose for counties in which the road is not located, such State road is not a county purpose in the county where it is located, the degree or frequency of use of a State road by the public of the several counties being inoperative to change the function and purpose of a State road from a State purpose to a county purpose. To hold that county roads are State roads would in effect be an adjudication that county taxation for county roads is for a State purpose in violation of the express command of the Constitution that county taxes shall be imposed "for county purposes and for no other purposes."

By the establishment of "the system of State Roads of this State," the same being "the property of the State," constructed throughout the State without regard to county lines, under State authority with State funds, the legislature has made such State roads a State function, expense and purpose; and the authority given the counties to donate "county roads bonds" to aid in the construction or maintenance of State roads, does not make such State roads a county purpose, even if, in view of the organic limitations upon county taxation, a State purpose may also be a county purpose for which county taxes may be imposed.

The constitution commands the legislature to provide for a uniform system of public free schools, which is a State function and purpose; but the constitution itself provides for county taxation for the support of public free schools therein. Secs. 1, 6 and 8 Art. XII. In other cases not specified in the constitution as in Section 15, Art. XII, Section 3, Art. XIII, Section 9 Art. XVI, as amended in 1894, county taxes may be levied "for county purposes and for no other purposes." Sec. 5 Art. IX. And a county cannot be authorized by statute to issue bonds involving county taxation for public free school purposes (State *ex rel.* Bours, v. L'Engle, 40 Fla. 392, 24 South, Rep. 539) ; nor can a municipality issue bonds for public free school purposes. Brown v. City of Lakeland, 61 Fla. 508, 54 South. Rep. 716; Munroe v. Reeves, 71 Fla. 612, 71 South. Rep. 922; State *ex rel.* Nuveen v. Greer, 88 Fla. 249, 102 South. Rep. 739.

The construction or maintenance of State property is obviously a State function and purpose and its location in and benefit to a county do not necessarily make it a county purpose. See State v. Craighead County, 114 Ark. 278, 169 S. W. Rep. 964; Wasson v. Wayne County Com'rs, 49 Ohio St. 622, 32 N. E. Rep. 472, 17 L. R. A. 795, Livingston

County v. Weider, 64 Ill. 427; Sleight v. People, 74 Ill. 47; People v. Scott, 9 Colo. 422, 12 Pac. Rep. 608. If this is not correct, then Leon County may levy taxes to maintain the State Capitol and other State buildings and grounds located in that county; Gadsden County may levy taxes to maintain the State Hospital located in that county; and so with Union, St. Johns, Jackson, Marion, Alachua and other counties in which State institutions or State property may be located. Location in and benefit to the county do not afford a complete test in determining whether a public improvement, e. g., a public road that is being constructed or maintained within a county, is a State purpose or a county purpose. Though daily used by the county, the streets of Tallahassee in Leon County are not thereby made a county purpose for which county taxes may be levied. Where, as here, the road is the property of the State being constructed independently of the county roads, with State funds, under State authority, as a part of a State system of public roads, over which county officials have no authority, the construction of the road is clearly a State purpose and not a county purpose, even though the road be located in a county and it is beneficial to the county. Even if the construction or maintenance of a public road may be both a State purpose and a county purpose within the meaning of the organic taxation provisions, the statutes of this State provide for a continuance of the county system of public roads under county authority and also make designated public roads between points in the State without reference to county lines or county roads "the system of State roads of this State," to be constructed with State funds, under State authority, wholly independent of and to the exclusion of county authority, thereby making the State system of public roads a specific State function and purpose as distinguished from a county function or purpose, and

showing an intent that the State system of public roads shall be constructed as a State purpose and not as a county purpose. This being .the primary and definite legislative intent, the legislation purporting to authorize the counties to contribute by taxation to the State purpose, was an incidental provision enacted apparently without due consideration of the express organic command that counties shall be authorized to "impose taxes for county purposes and for no other purposes." It must not be assumed that the legislature intended to violate the constitution; and as the main design of the lawmaking body, *i. e.*, the construction of a State system of public roads, can be accomplished in due course without the incidental aid through county taxation that would violate organic law, the portions of the enactments that conflict with the constitution may be regarded as eliminated. The constitution requires "a uniform and equal rate of taxation" and commands the legislature to "provide for raising revenue sufficient to defray the expenses of the State for each fiscal year" (Sec. 2, Art. IX); and the construction of a State road involves a State expense. The permissive and discretionary authority purported to be given the county commissioners by Chapter 8553 Actsof 1921, in aiding State Road construction by taxation, necessarily impairs uniformity of taxation for State purposes.

The statutes contemplate that several years will be required for constructing the designated system of State roads and the funds for such construction are provided with this in view. A desire to aid in hastening the completion of State roads is commendable, but the construction of State roads by State authorities independently of the county system of public roads, is a State purpose and not a county purpose; and to give such aid to State roads through county taxation would violate the organic com-

mands that the legislature shall provide sufficient revenue for State expenses, that taxation shall be uniform and that the counties shall impose taxes for no other than county purposes. Secs. 1, 2, 5, Art. IX Const.

In Cotton v. County Commissioners of Leon County, 6 Fla. 610, it was held that bonds issued under the Internal Improvement Act of 1855, by a county to *purchase property,* viz', *stock* of a railroad company organized to build a railroad through the county, was for a county purpose. The constitution of 1839 then in force did not contain the added words "and for no other purpose" that are in the present organic law; and the 1839 constitution contained a provision for "a liberal system of internal improvements," and did not forbid a county to become a stockholder in a corporation. See County Commissioners of Columbia County v. King, 13 Fla. 451.

The present constitution contains no provision as to internal improvements; expressly provides that a county may be authorized to impose taxes for county purposes "and for no other purposes," forbids a county to become a stockholder in a corporation. In the opinion in the Cotten case when discussing a "county purpose" under the taxation provision of the constitution it is well said: "Wisdom would counsel, that each case of this kind should be decided as it may arise, untrammelled by the decision of the preceding one." See also Skinner v. Henderson, 26 Fla.121, 7 South. Rep. 464; City of Bradentown v. State, 88 Fla. 381, 102 South. Rep. 556; State *ex rel.* v. Commissioners of Putnam County, 23 Fla. 632, 3 South. Rep. 164.

As State roads are "the property of the State," and as the State has made provision for and assumed the obligation of constructing State roads as "the system of State roads of this State" (Chapters 9311 and 10270, Laws of Florida), such construction is thereby made a *State pur-*

*pose* and a State expense to be provided for as required by Sections 1 and 2, Article IX of the Constitution. A separate system of county roads is established and being utilized in each county, and distinct and separate funds provided therefor. As the counties may be authorized to "impose taxes for county purposes and for no other purposes," it seems clear that a county cannot be authorized to impose taxes for a State purpose without violating the controlling organic law. This view accords with State *ex rel.* Milton v. Dickenson, 44 Fla. 623, 36 South. Rep. 1045, 1 Ann. Cas. 122, 60 L. R. A. 539, where a general law attempted to require the counties to provide the State Troops in the respective counties "an armory" for State purposes. See also State v. L'Engle, 40 Fla 392, 24 South. Rep. 539. The Constitution does not specifically limit State taxation to State purposes, and the statute authorizes the expenditure of State funds for "State Aid Roads," which are county roads. See Sec. 1197 Rev. Gen. Stats. 1920. See People *ex rel.* Chicago, B. & Q. R. Co., 266 Ill. 63, 107 N. E. Rep. 249.

It is suggested that the construction of a State road in a county may also be a county purpose as it would be beneficial to the county. But the legislature has made the construction of a system of State roads a State function and purpose distinct from the county system, and it appears to be obvious that a county tax "to aid in the construction of a State road," that is "the property of the State" being constructed by the State for its purposes, would violate the express provisions that the county tax shall be "for county purposes *and for no other purposes.*" This is inevitably so where the State roads are in addition to and distinct from the roads of the county system, even though the people of the county use the State roads in common with the general public. The public of the State use the

county roads, but such use of county roads does not make them a State purpose. If the construction of a public road may be both a State purpose and a county purpose, it has not been so made by the legislature. Chap. 8553, Acts of 1921, attempts to authorize the county commissioners to donate to a State Board for a State purpose, county bonds to be paid for by county taxation. Such legislation plainly violates the express command of the constitution that the counties shall impose taxes ''for county purposes and for no other purposes.'' Sec. 5, Art. IX.

It would hardly be contended that a county tax may legally be imposed to construct or to reconstruct or to maintain the driveway and walks in the capitol grounds at Tallahassee, though the people of the county use daily such driveway and walks for their private purposes wholly unconnected with any business with or for the State. The driveway and walks in the Capitol grounds are ''the property of the State,'' and so are the State roads. The construction or maintenance of the one is as essentially a State purpose as is the other. The county system of public roads is preserved; and it is manifest that the legislature in providing for a separate system of State roads to be constructed by the State largely by excise taxes on gasoline and automobiles, and then attempting to authorize the counties of the State to impose property taxes, ''to aid in the construction or maintenance of any State road,'' (Sec. 1, Chap. 8553 Acts 1921), did not give due consideration to the express organic provision that the counties may be authorized to impose taxes ''for county purposes and for no other purposes''; and that the quoted organic provision was violated in enacting at least some of the provisions of Chapter 8553, Acts of 1921, which renders such provisions of the statute inoperative. It does not appear that the State roads here considered are designed to serve a distinct

county purpose (Skinner v. Henderson, *supra*), if that would be material here. A system of public roads between widely separated points in the State, constructed by State authority with State funds, without reference to county lines or county roads, is essentially a State purpose and the constitution provides that "the legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year." Sec. 2, Art. IX. The expense of constructing a "system of State roads of this State" is a State expense and not a county expense. Chapter 8553 Acts of 1921, if otherwise valid, is not sufficient to amend Sections 1531 *et seq.* Revised General Statutes, under which latter statutes county bonds may be issued for county purposes. Neither Chapter 8553 nor any other statute provides for levying a county tax for constructing State roads, so there can lawfully be no such tax levy. Sec. 3, Art. IX Const.

The essential difference between the facts and the controlling law in this case and in Cotten v. County Commissioners of Leon County, *supra,* have been noted. In Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 688, the waterway was not exclusively "the property of the State" and its improvement had not been assumed by the State as a State function and purpose, and the special statute had in effect designated the improvement as a county purpose. See also State *ex rel. Young* v. Duval County, 76 Fla. 180, 79 South. Rep. 692. In County Com'rs of Escambia County v. Board of Pilot Com'rs of Port of Pensacola, 52 Fla. 197, 42 South. Rep. 697, the State had not assumed to itself as a State purpose or function, the burden that was by law put upon the county as a county function and purpose. In Rushton v. State *ex rel.* Collins, 75 Fla. 422, 78 South. Rep. 345, the expenditure was for a service rendered the county in enforcing the law, which is made a county purpose and func-

tion by Section 9, Art. 16, Constitution as amended in 1894, Acts of 1893, p. 400. In Jordon v. Duval County, 68 Fla. 48, 66 South. Rep. 298, a special statute authorized the county to erect on county property an armory building that could be used by the members of the State Militia in the county, subject to the control of the county commissioners, which made it a county function subject to county authority. In Dade County v. City of Miami, 77 Fla 786, 32 South. Rep. 354, the county was required to pay to the city a portion of a county road tax that had been paid on property in the city. See Hillsborough County v. State *ex rel.* City of St. Petersburg, 57 Fla. 50, 48 South. Rep. 976; County Com'rs of Duval County v. City of Jacksonville, 36 Fla. 196, 18 South. Rep. 339. See State *ex rel.* Town of Kirkwood v. County Court of St. Louis County, 142 Mo. 575, 44 S. W. Rep. 734.

In Getzen v. Sumter County, — Fla. —, 103 South. Rep. 104, the roads were apparently all county roads; the primary roads were in the original soft sandy soil and the need for hard surfaced roads was imperative; the valuations for tax purposes were very low; the resources of the county were being rapidly developed; the bonded debt of the county was being materially reduced and the taxable values were materially increasing. In this case the roads to be constructed are in greater part State roads and a part of "the system of State roads of this State," which State roads are being constructed under State authority by State funds derived in greater part from excise taxes on gasoline and automobiles; the county has an abundance of clay roads; the valuations for tax purposes are relatively very high; the bonded debt is not being materially reduced; the taxable values in the county are not greatly increasing; the State roads that are here designated to be aided by county taxation, practically parallel county roads that are in good

condition and in constant use; and the particular additional State roads here considered are not essential to the development of the important resources of the county, the present county roads in proper upkeep being ample for that purpose, while the State roads here involved are designed mainly for through traffic to points beyond the county lines, all of which points are now reached by the daily use of good county roads to the county lines, connecting therewith other roads in daily use. In this case the State exclusively owns the State roads and has assumed the burden of their construction, thereby making such construction a State function and purpose. The State roads here considered do not connect public highways of the county and they are designed to serve not a county purpose, but a State purpise. The greater part of the mentioned State roads being distinct from and in addition to the county system of public roads, the organic intent that county taxes shall be imposed for no other than county purposes, and that taxation shall be equal and uniform, would clearly be violated if county taxes be imposed in the county to aid in the construction of State roads in the county that are wholly distinct from the county roads.

As to the roads that are "the property of the State" and are a part of "the system of State roads of this State" and are now being constructed with State funds under State operation as a system of public roads separate and distinct from the county system of public roads, the tax levy to pay the bonds and interest thereon to aid in the construction of such State roads would be for a State purpose and not for a county purpose, and would impose an unequal rate of taxation for a State purpose thereby violating Sections 1, 2 and 5 of Article IX of the State Constitution. The collective proposition to issue county bonds was acted on as an entirety, and if partly illegal the entire

proposition should fail. Essential portions of the collective proposition that was submitted and voted on have been changed in substance and purpose by legislative or other official action, and at least some of the bonds, even if otherwise lawfully authorized, cannot be used for the specific object designed by the county commissioners and the voters. Some of the roads. designated are State roads and not county roads; and as such State roads are being now constructed by the State as a State system distinct from the county system, the proposed greatly increased tax burden for a State purpose is an unauthorized exercise of the taxing power that a majority vote of the electorate does not legalize. See State *ex rel.* Potter v. King County, 45 Wash. 519, text 528, 88 Pac. Rep. 935; Allen v. Louisiana, 103 U. S. 80.

"A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubt upon that score." United States v. Jin Fuey Moy, 241 U. S. 394, 36 Sup. Ct. Rep. 658; Attorney General of the United States v. Central R. Co. of New Jersey, 213 U. S. 366, 29 Sup. Ct. Rep. 527; Beander v. Barnett, 255 U. S. 224, 41 Sup. Ct. Rep. 271; Bratton v. Chandler, 260 U. S. 110, 43 Sup. Ct. Rep. 43; Federal Trade Commission v. American Tobacco Co., 264 U. S. 298, 44 Sup. Ct. Rep. 336; United States v. American Brewing Co., 251 U. S. 210, 40 Sup. Ct. Rep. 139; City of Jacksonville v. Bowden, 67 Fla. 181, 64 South. Rep. 769; In re Seven Barrels of Wine, 79 Fla. 1, 83 South. Rep. 627; Burr v. Florida East Coast R. Co., 77 Fla. 259, 81 South. Rep. 464; Langford v. Odom, 77 Fla. 282, 81 South. Rep. 469. See also Commissioners of Johnston County v. Lacy, 174 N. C. 141, 93 S. E. Rep. 482, 2 A. L. R. 726.

The statutory authority given to the county commissioners of a county to establish and maintain "any road or

highway in their respective counties" (Sec. 1475 Rev. Gen. Stats.) and to issue bonds "for the purpose of constructing paved, macadamized, or other hard-surfaced highways," (Sec. 1531 Rev. Gen. Stats.) must have reference to roads or highways that are maintained under the authority of county commissioners for county purposes as distinguished from State highways that constitute "the system of State roads" that are "the property of the State" constructed with State funds under State authority for State purposes; since it must be assumed that there was no legislative intent to.violate the organic law which forbids county taxation for other than county purposes.

The provision of Chapter 8553, Acts of 1921,. that any county is authorized to aid in the construction or maintenance of any State road by contributions to the State Road Department of cash, bonds, &c., including county road bonds which have been or which shall hereafter be voted by the people of the county, to be used in the construction or maintenance of any State road, involves the imposition of a county tax upon property in the county for a distinctly State purpose; and even if Chapter 8553, Acts of 1921, is sufficient to amend the statutes under which county bonds may be issued, it is in conflict with the provisions of the constitution that no tax shall be levied except in pursuance of law, that the legislature shall provide revenue for State expenses, that taxation shall be uniform and that counties shall not impose taxes for other than county purposes, which conflict of the legislative provisions with organic law, renders the legislation inoperative and the action of the county commissioners unauthorized, the constitution being paramount to control the action of the legislature and of the administrative officers as well as of the courts. A donation of "county road bonds" involving county taxation to aid in constructing State roads is

an obvious violation of the organic provision that counties may impose taxes only for county purposes.

The county commissioners assume authority to issue county bonds ''for the purpose of constructing and aiding in the construction of paved, macadamized or other hard surface highways in the county,'' to-wit: designated State roads and designated county roads in the county, by virtue of Section 1531, Revised General Statutes of 1920, which gives authority to issue county bonds ''for the purpose of constructing paved, macadamized, or other hard-surfaced highways'' and by virtue of Section 1, Chapter 8553, Acts of 1921, which purports to authorize any county ''to aid in the construction or maintenance of any State road by contribution to the State Road Department of cash, bonds, time warrants, or other thing of value in the construction or maintenance of roads,'' including ''county road bonds'' which have been or may be voted by the people of the county. This claim of authority as to aiding in the construction of State roads is manifestly untenable for several imperatively controlling and obvious reasons, viz:

1. Section 1531, Revised General Statutes of 1920, authorizes county bonds for county roads and not for State roads.

2. Chapter 8553, Acts of 1921, if not invalid because it contains plural subjects in its title and in its body in violation of the first clause of Section 16, Article III of the constitution, the chapter does not purport to amend Section 1531, Revised General Statutes of 1920; and if it does so purport, it is ineffectual because the section is not ''re-enacted and published at length'' as required by the last clause of Section 16, Article III.

3. If Chapter 8553 by implication amends Section 1531, Revised General Statutes of 1920, it is ineffectual because Chapter 8553 does not provide for issuing bonds, and

neither chapter 8553 nor any section of the Revised General Statutes of 1920, provides for levying a tax to pay the interest and principal of county bonds to aid in the construction of State roads, and Section 3, Article IX, of the constitution provides that "no tax shall be levied except in pursuance of law."

4. As county bonds require county taxes to pay the bonds and as the greater part of the proposed county bonds are to construct and aid in the construction of State roads which is a State purpose and not a county purpose, the levy of a county tax for that purpose, even if there were a statute authorizing it, would violate the express provision of Section 5, Article IX of the constitution that counties shall be authorized to "impose taxes for county purposes, and for no other purposes."

5. State highways are State property, constructed under State authority and for a State purpose, wholly distinct from a county purpose, which makes such State highways a subject of State expense; and Section 2, Article IX, of the constitution commands that "the legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year."

6. Section 1, Article IX, of the constitution requires "a uniform and equal rate of taxation;" and the permissive and discretionary authority given the county commissioners by Chapter 8553, Acts of 1921, even if otherwise valid, inevitably impairs uniformity and equality in taxation for a State purpose.

7. In view of the organic limitations upon the taxing power, the proposed county bond issue involving county taxation for a State purpose, would deny to the taxpayers of the county the equal protection of the laws and would otherwise violate rights secured to the citizens of the

county by express provisions of the State constitution, and of the Fourteenth Amendment to the Federal Constitution.

The legislature may validate administrative acts that it could have authorized (Charlotte Harbor & N. R. Co. v. Wells, 78 Fla. 227, 82 South. Rep. 770; Charlotte Harbor & N. R. Co. v. Wells, 260 U. S. 8, 43 Sup. Ct. Rep. 3; City of Jacksonville v. Basnett, 20 Fla 525; Givens v. Hillsborough County, 46 Fla. 502, 35 South. Rep. 88; Cranor v. Volusia County Com'rs, 54 Fla. 526, 45 South. Rep. 455; Anderson v. City of Ocala, 83 Fla. 91 South. Rep. 182) ; but acts that could not lawfully be authorized by statute, cannot be validated by legislation (State ex rel. Nuvenn v. Greer, 88 Fla. 249, 102 South. Rep. 739, text 747; 12 C. J. 1091; 15 C. J. 627; Ellis v. Northern Pac. R. Co., 77 Wis. 114, 45 N. W. Rep. 811, and as in view of the organic provision limiting county taxation to county purposes, the legislature was without power to authorize the issue of county bonds involving county taxation to aid in the construction of State roads, which is a State purpose and not a county purpose, the legislature is likewise without power to validate an issue of county bonds for the State purpose, therefore the enactment of Chapter 10788, Acts of 1925, purporting to validate the bond election is a mere irrelevancy.

The resolution of the county commissioners submitted "to the legal voters of said county, the question whether such bonds shall be issued," such election to "be conducted as near as may be in the manner provided for conducting general election." It also appears that "a majority of the votes cast at said election was for bonds." Chapter 9294, Acts of 1923, limits the electorate in the county bond elections to "free holders" who are otherwise qualified as voters in the county. A compliance with the statute is material, but does not appear. See Anderson v. City of Ocala,

87 Fla. 257, 99 South. Rep. 667; 15 C. J. 595; Bullock v. Curry, 2 Metcf. (Ky.) 171.

ELLIS, J., dissenting.—The legislature is inhibited by Section 5 of Article IX from authorizing counties to assess and impose taxes for any purpose other than a county purpose.

A county is a political division of the State. Section 1, Article VIII, Constitution.

The power to assess and impose taxes is a State power and may be exercised only by the sovereign power except where that power is under the constitution authorized to be delegated to State agencies for certain purposes. The power to tax is inherent in the State. It is not granted by the constitution, but of necessity undertakes it because government could not exist or perform its functions without it. It exists as a necessary attribute of sovereignty. 26 R. C. L. 26. Constitutional provisions therefore relating to the power constitute limitations upon the power which would otherwise be without limit. See M'Cullough v. State of Maryland, 4 Wheat. (U. S.) 316, text 428, 4 L. Ed. 579, text 607; Nathan v. State of Louisiana, 8 How. (U. S.) 73, text 82, 12 L. Ed. 992, text 996; Lane County v. State of Oregon, 7 Wall. (U. S.) 71, text 76, 19 L. Ed. 101, text 104; Wheeling, Parkersburg & Cincinnati Transp. Co. v. City of Wheeling, 99 U. S. 273, text 281, 25 L. Ed. 412, text 415; United States v. Snyder, 149 U. S. 210, text 214, 37 L. Ed. 705, text 707, 13 Sup. Ct. Rep. 846.

The power of deciding what money shall be raised by taxation, what property or privileges or occupations shall be taxed, rests exclusively in the legislature without any limitations except such as are imposed by express constitutional provisions. 26 R. C. L. 27.

The power of a county to assess and impose taxes is derived from legislative authority, but that authority is

restricted by the constitution to county purposes and prohibited from being extended to any other purpose. Sec. 5, Art. IX Const.

A county organization consists of a Board of County Commissioners; a Clerk of the Circuit Court; a Sheriff; Constables; a County Assessor of Taxes and Assistants; a Tax Collector; a Superintendent of Public Instruction; a County Surveyor; a County Judge; Justices of the Peace, and such other officers as may be provided by law. The powers and duties of such officers are prescribed by statute except those of the judicial officers which in the main are prescribed by the constitution.

The county officers are agencies through which the State operates to perform many of its functions in the execution of the law. But the maintenance of the organization is considered a county obligation in greater part.

The constitution imposes no duties upon counties as such except in the matter of providing for those inhabitants who by reason of age, infirmity or misfortune have claims upon the aid and sympathy of society and in the matter of the support of public free schools; but the duties of officers of counties and their compensation except where the constitution makes such provisions are provided for by legislative enactment.

The duty of providing for the expenses which are legitimately incurred within the powers or duties of those who have some official or representative relation to the county is a county burden or obligation and is met by a tax assessed or imposed upon property in the county or upon occupations carried on therein. Upon this principle the construction and maintenance of certain public buildings is a county obligation for which the Legislature may authorize the counties to assess and impose taxes to discharge.

The establishment and maintenance of a system of public free schools is a State function in the discharge of which the constitution requires counties as such to aid. Sec. 8, Article XII Const.

The prosecution of persons charged with crime is a State function, but the constitution provides in some measure for the counties defraying part of the expenses incurred in such work. The salaries of certain Circuit Judges are paid in some instances by counties, but only under authority of a constitutional provision.

The building of roads and bridges and the maintenance of the same is a function or duty of the State. See Keggin v. Hillsborough County, 71 Fla. 356, 71 South. Rep. 372.

The constitution contains no provision directly charging nor authorizing the legislature to charge the counties with the construction and maintenance of roads and bridges. But counties are created to aid in the administration of government. They are local, legal subdivisions of the State and are agencies or arms of the State created, organized and existing for civil and political purposes, particularly for the purpose of administering locally the general powers and policies of the State. 15 C. J. 388.

Under a system long established in this State and unquestioned, the State function of building roads and bridges and the maintenance of the same in the different counties was delegated to the counties respectively. Under that system the construction and maintenance of public roads were purely local functions, completely under county control and subject to county discretion as to location, change, abandonment, width and grade. See Section 1588 Revised General Statutes, 1920. No public road could be established, changed or discontinued except on application to the county commissioners by petition signed by citizen free-holders living in the vicinity of the road sought to be

changed or established. See Chapter 4338, Acts of 1895, and amendments thereto of 1903-1905; Chap. 4769, Acts of 1899. In 1913 there was a revision of the subject, but the boards of county commissioners continued under that act with some modifications to exercise complete control over the establishing, building and maintenance of public roads. Chap. 6537 Laws of 1913.

This system continued until 1915, when a State Road Department was created, but the purpose of that act seemed to be to provide county commissioners with information as to the best methods and materials to be used in road construction and to expend whatever funds the Congress of the United States might appropriate for road construction in Florida. Memorials to Congress had at other sessions and the session of 1915 been adopted requiring the Florida Senators and Representatives in Congress to use their influence to get such an appropriation. See Chapter 6883, Laws of 1915.

Under the system existing in this State to 1916 the building of roads and bridges was considered to be a county purpose. It was said that while such activity was a State function or duty the delegation of the performance of that duty to the officers of the political divisions constituted it a county purpose. Under the system which had existed since the organization of the State without objection or protest, road construction and maintenance became one of the purposes of county organization. Keggin v. Hillsborough County, *supra*.

In the case of Jordan v. Duval County, 68 Fla. 48, 66 South. Rep. 298, this court speaking through Mr. Justice WHITFIELD, said: ''The term 'county purposes' is not defined or amplified in the organic law. This being so the legislative power in exercising its appropriate lawmaking functions, may determine what is a county purpose and

the courts are not authorized to render such determination ineffectual unless some provision of the constitution is violated·or unless the particular enactment can have no legal or practical relation whatever to any county purpose.''

In the case of Cotten v. County Commissioners of Leon County, 6 Fla. 610, this court said that neither locality of the proposed work nor benefits to the county taken by itself affords a safe criterion or correct rule for determining whether a particular proposition is or is not a county purpose, but as a general rule it required a concurrence of both. It was also observed that it would be as improbable as it was dangerous to attempt to prescribe any denifite rule to be looked to as furnishing any correct test on the subject. See Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 688.

In the above named case the proposition was to improve the navigation of the St. John's River in Duval County and to remove obstructions therefrom. An Act of the legislature authorized Duval county to issue bonds for that purpose. The court held the proposed work to be a county purpose and refused to restrain the issuing of the bonds. In reaching that conclusion the court held the St. John's river to be a highway; that whether the commerce and business on the river local to the county is small or of no importance in ''our judgment'' does not affect the power of the legislature to authorize the improvement, and quoting from Cotten v. County Commissioners, *supra*, said we must look to contemporaneous legislation on the subject and ''that by making this reference it will be abundantly demonstrated that at that day county purposes were taken to embrace principally the erection and repair of court houses and jails, the opening and maintaining public thoroughfares within the limits of their respective counties by opening roads, building bridges and causeways and keep-

ing the same in repair," &c. So the decision in the Stockton-Powell case *supra* rests upon the postulate that at the time the act in question was passed, June, 1891, under the policy then existing of the State government with reference to public roads and highways the construction and maintenance of the same were county purposes.

But that is the very point in issue in this litigation. Whether under the policy now existing of the State government with reference to a certain State road, not all county roads and highways, but certain designated State roads over which the State has assumed entire control and management as to construction, maintenance, location, width, grade, materials, change, abandonment and use, and which are declared to be the property of the State, can it be said that the construction and maintenance of such highways, or so much of them as lie within a county, are county purposes within the meaning of the constitution? It is perfectly apparent that neither the case of Cotten v. County Commissioners, *supra,* nor Stockton v. Powell, *supra,* is in point.

Now if the Legislature in the exercise of its appropriate lawmaking functions may determine what is a county purpose, Jordan v. Duval County, *supra,* has it not by the exercise of its appropriate lawmaking power definitely and clearly determined that the building and maintenance of certain State Highways or Public State Roads is a State purpose? See Chapters 9311-9312 Laws of 1923.

In 1917 the policy of the State with regard to public roads was changed by the adoption of a new and different system from that which had existed prior to the passage of Chapter 7329, Laws of 1917. Under the provisions of that Act the State Road Department was authorized to locate and designate certain roads in the State as State Roads and to construct and maintain the same with funds which

are now or may hereafter become available from the State or the State and Federal Government. The Board was also authorized to designate other roads as State Aid Roads, all of which were to be built under the supervision and control of the State Road Department. State Aid roads were defined as roads which, in the construction and maintenance of, the State may render assistance to the counties.

Under Chapter 9311 some of the roads for the "constructing and aiding in the construction of" the bonds of Leon County in this case are to be issued, were declared, designated and established as State Roads.

It seems to be clear that beginning with the Act of 1917, Chapter 7328, *supra,* it became the definite purpose of the State through legislative enactment to adopt a new and entirely different system for the construction and maintenance of public roads in this State. All the public roads or highways not including navigable rivers and lakes were classified and placed in three classes: First, State roads to be constructed and maintained with State funds and Federal funds; second, State Aid Roads, which in the construction and maintenance of the State may render aid to the counties respectively, and third, such roads and highways, local in character, which under the old system the county commissioners are authorized to construct and maintain under the provisions of the law.

The classification of roads as State Roads and County Roads is not new. The distinction was made by the State of Ohio by a decision of the Supreme Court of that State in 1848. That State was among the first of the States to begin the work of road development and improvement and many of the road laws of the country are largely derived from the laws of that State. A State Road was defined to be "a road running into two or more counties and is distinguished by this from a county road which lies wholly

within one county. The first was formerly established by Acts of special legislation; the latter by county commissioners under general laws.'' See Ohio *ex rel.* Stebbins v. Treasurer of Wood County, 17 Ohio 184; 15 Am. & Eng. Encyc. Law 352.

The State if it deems proper to do so can take immediate charge by its own agents of certain Public Highways because it is one of the functions of government to provide public highways for the convenience and comfort of the people. It may undertake that work directly or by a county which is a governmental agency. See Atkin v. Kansas, 191 U. S. 207, 48 L. Ed. 148, 24 Sup. Ct. Rep. 124; 13 R. C. L. 79.

This State is not prohibited by the constitution from itself engaging in the work of building and repairing public highways.

Roads established by the Legislature are under legislative control and are therefore a State enterprise or function, and belong to the State. State *ex rel.* v. Board of Com'rs of Marion County, 170 Ind. 595, 85 N. E. Rep. 513; 1 Elliott on Roads & Streets, Par. 10. Now by the Act of 1923, Chapter 9311, certain roads were declared, designated and established as State Roads. State Roads Numbered One, Ten and Nineteen were among those so established, Number One extending across the State from west to east from a point on the Alabama State line in Escambia county to Jacksonville in Duval county; number Ten, extending from the Georgia State line near Beachton to East Point and number Nineteen extending from a point east of Tallahassee on State Road number One to Williston. The Act provided that the roads named and numbered therein shall be and constitute the ''System of State Roads of this State,'' and when located and constructed by the State Road Department shall ''become and be the property

of the State.'' The State Road Department was empowered to determine and fix the lines and locations of such roads between the cities and places named in the Act. The State Road Department had the power to utilize old country roads or lay out new ones in determining and fixing the lines and locations of the State Roads named. Under the provisions of Chapter 9312, Laws of 1923, the State Road Department was vested with the power of eminent domain to condemn all necessary land and property for the purpose of securing rights of way and building material for ''State Roads.'' Injuries to such roads by the wrongful act of persons using them are to be compensated in damages and recovered by suit maintained by the Road Department and paid over into the State Treasury to the credit of the State Road Tax Fund. By Chapter 9309, Laws of 1923, a State tax of one mill on each dollar of taxable property within this State for the years 1923 and 1924 was levied for the purpose of constructing roads in this State as provided for in an Act of Congress approved July 11, 1916, entitled ''An Act to provide that the United States shall aid the States in the construction of rural post roads and for other purposes.'' The State Road Department was authorized to receive the grants of money appropriated under the Acts of Congress and apply the same to the public roads and bridges in the State in accordance with the terms expressed in such Acts. A like Act was passed in 1921, Chapter 8575, levying a like tax for the years 1921 and 1922. Chapter 7327, Acts of 1917, definite appropriations were made for the years 1916-1917 and 1918 for the same purpose. For the years 1919 and 1920, a tax of two mills on the dollar was levied for the same purpose by Chapter 7901, Acts 1919. In 1921 a License Tax upon dealers in gasoline was imposed for the ''State Road License Funds,'' and in 1923 a license tax on dealers in gasoline and a tax of three cents per gallon for every gal-

lon sold was levied for the same purpose, and in 1925 a license tax and a tax of four cents per gallon of gasoline sold was levied for the same purpose.

It is difficult to perceive how the Legislature could have more certainly and effectively determined to take over as a State function or purpose the establishment, construction and maintenance of certain public roads.

Having done that, the State withdrew from the counties so much of the public road construction and maintenance power which had been delegated to and exercised by them as related to the special roads known and designated as State Roads enumerated in the Act of 1923, Chapter 9311, *supra*. So the construction or maintenance of such roads or any part of them became no longer a county purpose.

It is perfectly obvious in such case that the circumstances of locality and benefits cannot render the construction and maintenance of any part of such road a county duty or purpose.

The establishment, construction and maintenance of such roads are as completely a State purpose as distinguished from a county purpose as the building and maintenance of the State Capitol and grounds; or the State Hospital at Chattahoochee, or the Florida School for the Deaf and Blind in St. Johns County, or the Florida State College for Women at Tallahassee, or the University in Alachua County. An Act authorizing the counties in which either one of the above named institutions is located, to issue bonds to aid the State in the repair and maintenance of such institutions would probably be held to be invalid as not being for a county purpose. Yet by what test or peculiar feature or property could either of the above named institutions be differentiated from the institution of State Roads designated by the Act of 1923 that would fix the character of one as a State purpose and the other as a county purpose?

Certainly not the fact of locality, benefits or use by the public. So that it is plain a county purpose and a State purpose are governmental functions fixed and determined by legislative enactment within the limitations prescribed by the constitution.

A county being a mere political division of the State and a municipality a mere State agency with some modifications, the phrase "county purposes" as used in Section 5, Article IX of the Constitution can relate only to governmental functions which are or may be performed by municipality, county or State. When the State acts through the Legislature in the appropriate exercise of its power and declares any function to be distinctively a State function or purpose, that particular function becomes no longer either a municipal or county purpose, and cannot become so because of locality, benefit or use, or all combined.

For that reason the purpose so declared to be a State purpose cannot be both county and State because the retention, possession, occupancy by the State of the particular activity primarily governmental in nature precludes the idea of county interference or co-operation. Especially is this proposition true in view of the provision of the constitution that taxes may be assessed and imposed by counties for county purposes and "no other purposes." The latter phrase was not used either in the constitution of 1838 or that of 1865. If there can be such a purpose as a "State and county purpose," even in such case the purpose could not be said with due regard to the meaning of words to be a "county purpose." It would have to be classed as a purpose other than "county purpose." When the legislature classifies or designates activities as State, county or municipal functions or purposes, such classification becomes fixed and it is doubtful if any activity, so classified can be conceived of as partaking of the nature of any other

class than that in which it is placed by legislative authority.

The case of Skinner v. Henderson, 26 Fla. 121, 7 South. Rep. 464, contains *obiter dictum* which seemingly is contrary to the proposition that a purpose can be both county and municipal so that the county would be authorized to raise money by taxation for such purposes. The dictum seems to rest upon the assumption that the county having the power to designate the place and pay the entire cost of the bridge construction as well as to determine the character and qualities of the material used, it could lawfully pay for part of the cost of construction. But such was not the case presented. The point was not necessary to the decision, nor are the facts analogous to this case, as the county of Leon has not the power to locate any part of either State Road, determine its width or grades, or prescribe the materials to be used in construction or regulate its use or maintain an action for damages for injury to it.

The petition alleges that the County Commissioners of Leon County, acting under the provisions of Sections 1531, 1533 and 1534, Revised General Statutes, adopted a resolution declaring that the Board deemed it expedient and for the best interests of the county to issue bonds of the county for the purpose of "Constructing and aiding in the construction" of paved, macadamized or other hard-surfaced highways in Leon County. That the proceeds derived from the sale of the bonds after deducting expenses of issue should be apportioned and expended upon certain roads named. Among the roads named were certain State Roads. The total amount of the bond issue was One million five hundred thousand dollars, of which one million and sixty-nine thousand was to be appropriated to and expended in aid of the construction of State Roads numbered One, Ten and Nineteen. Those roads are roads over which the county has

no jurisdiction or control, could not construct and has no voice in the location of same; has no power to prescribe the route, grade or width of the same, nor any power to prescribe the materials of which they may be built. So the greater portion of the bond issue is proposed to be utilized not in constructing, but "aiding in the construction of" certain State Roads. The statute does not authorize the issue of county bonds for any such purpose. The authority granted to the county is to issue bonds for the "purpose of *constructing* paved, macadamized or other hard-surfaced highways." The Act of the Legislature, Section One of which became Section 1531, Revised General Statutes, was Chapter 4711, Acts of 1899. At the time that Act was passed and when the Revised General Statutes went into effect, the construction of all roads or public highways was under the road system then prevailing, a county purpose. The State had not definitely declared the building, maintenance and regulation of certain roads to be exclusively a State purpose or function. The State may aid the county in the construction and maintenance of certain highways which under the system now esatblished is still a county purpose, but the county may not aid the State in the construction of certain highways the construction and maintenance of which are declared by valid legislative enactment to be exclusively a State function or purpose. Nor was the statute under which the proposed bonds are to be issued enacted in contemplation of such case, nor is its language broad enough to comprehend it. Because as the county has not the power to construct such roads, it cannot be said that the power to construct carries with it the power to aid in the construction. And the power is limited to construction, an act which the county has not the legal power to do.

There is still another phase of the proposition to which it may not be amiss to call attention. The State by legis-

lative enactments has established a new system of public highways, in which certain highways are expressly declared to be State Roads, the construction, maintenance and control of which are declared to be a State function and which by name and number are segregated from and taken out of the class of roads which under that system the counties may still designate, construct and maintain as a county purpose and placed in a different class over which the State exercises complete control. The funds to be used for the construction and maintenance of such State Roads is created and raised by a tax upon property, excise taxes and appropriations by Congress. That portion of the fund to be raised by taxes must come from a tax uniform and equal in rates and levied in pursuance of law. Sections 1 and 3, Article IX Const. A State Road as designated by the Act of 1923, Chapter 9311, is a continuous highway between designated points within the State for the construction and maintenance of which the State Road Department is required in January of each year to make up a budget of such work for the ensuing year. It is not within the legal power of the Board to discriminate between certain localities along such highway by constructing the road in some places of superior and expensive material, while the other localities construct the road of inferior and less expensive material. The cost of construction should vary on such State Roads no more than the topography of the country and the character of the soil on which the road bed is laid makes necessary. Otherwise there would be an unjust distribution of public funds and an unequal burden of taxation to support such State purpose. An opportunity would thus be afforded for a favoritism of localities which could be justified by no consideration consistent with a fair administration and use of public funds. To abstain even from the appearance of evil is a safe standard of official as well as moral conduct.

Neither has the Board the power to compel a county to issue bonds in aid of the construction of a State Road, nor by offering it an alternative of an inferior character of road through the county endeavor to persuade it to aid in the construction of it by an issue of bonds. If the Board had any such power it could determine the amount necessary to be raised for such purpose and deprive the Board of County Commissioners of that discretion secured to it by Section 1531, Revised General Statutes, *supra*. If the State Board has no such power then the taxation in aid of the construction of such roads would be made to depend not upon a rule or statute securing uniformity for the purpose, but upon the opinion or will of the particular Board of County Commissioners of the counties respectively through which the State Road is established by State authority.

In such case it would be legally possible for one county by taxing the property within its limits aid in whatever sum its commissioners deemed convenient, while another county could refuse altogether to aid in any sum, yet the people of each would have the use and enjoyment alike of the same road facilities. The distribution of the burden of taxation for such a general purpose, and in the execution of a State function, could not in fairness be made to depend upon a system of such doubtful efficiency.

Chapter 8553, Laws of 1921, is referred to as authorizing the counties and Special Road and Bridge Districts in this State to "aid in the construction or maintenance of any State or State Aid Road by contributions to the State Road Department of cash, bonds, time warrants or other things of value," but if the construction of a State Road is not a county purpose, the act is ineffectual as authorizing the expenditure of county funds for purposes other than county purposes. The Act of 1925, Chapter 10788 approved May 19, 1925, purporting to validate the Special Bond Election held in Leon County under the resolution

adopted by the Board of County Commissioners referred to in the petition is ineffectual to give validity to the Bonds to be issued because the purpose of such bond issue is for a purpose other than a county purpose in contravention of the section of the constitution to which reference has been made. A validating Act of that nature can only cure irregularities in the exercise of a lawful power that exists or may have been conferred, which irregularities were not in relation to some procedure which the legislature in the Act conferring the power may not have in the first instance omitted as unnecessary to the exercise of such power. But a curative statute will not have the effect to validate acts which the legislature could not have previously authorized. See 36 Cyc. 1222; Wright v. Johnson, 108 Va. 855, 62 S. E. Rep. 948.

I am of the opinion therefore that the demurrer to the petition should have been sustained and the motion to strike the answer of the intervenors denied. In my opinion therefore the decree of the court validating the bonds should be reversed.