Ernest Amos, as Comptroller of the State of Florida, and W. V. Knott, as Treasurer of the State of Florida, *Appellants*, v. John E. Mathews, *Appellee*.

Division A.

Ellis, J. (concurring)—The above entitled two causes, while not involving identical questions throughout, are in relation to the same subject matter and involve a financial policy of the State developed in the legislation of the Extraordinary Session of the Florida Legislature of 1929. The subject of such legislation was the collection and distribution of an excise tax on gasoline to provide funds for the expenses of the State Road Department; the payment and ultimate retirement of county and road district bonded indebtedness incurred to build state highways and local roads; to aid county public schools and to aid counties for school purposes and for building roads and bridges and their maintenance.

The Acts involved are Chapters 14486, 14573 and 14575. Each act was approved by the Governor on the same day. Two of them, Chapters 14486 and 14573 to take effect upon becoming a law, which was the date of approval by the Governor; and the third, Chapter 14575 to take effect on

July 1, 1929. See Parker v. Evening News Company, 54 Fla. 482, 44 So. R. 718; Art. III, Sec. 18, Const. of Florida.

For the purpose of obtaining a view in legal perspective as it were of the State's economic policy so far as it is developed by the statutes mentioned, a brief synopsis of each act might be helpful to the end that the aspect of the subject under investigation may be seen in all its relations and the vanishing point of constitutional objections, if any exist in reality, more clearly perceived.

The title to Chapter 14486, *supra,* is as follows: "AN ACT Providing for Depository of Sinking Funds and Delinquent Taxes and Other Moneys for Road and Bridge Indebtedness of the Counties and Special Road and Bridge Districts of the State or Otherwise, Authorizing the Issuance of Refunding Bonds by Said Counties and Special Road and Bridge Districts, and Providing for the Creation of a Board of Administration and the Disbursement of such Funds to Pay Such Indebtedness and the Use of Any Surplus in Any County for the Construction and Maintenance of Roads and Bridges."

There are three subjects definitely announced in that title: first, the creation of a depository for funds for road and bridge indebtedness of counties and special road and bridge districts of the State "or otherwise"; second, authorizing the issue of refunding bonds by counties and special road and bridge districts; and third, the creation of an agency of administration and providing for disbursement of the funds to pay the indebtedness and the use of *any* surplus in *any* county for the construction and maintenance of roads and bridges.

The word "depository," as used in the title of the Act, means a person with whom funds or securities are placed and not the place where they are deposited. This meaning is evident from the provisions of the Act which names

the officer, "State Treasurer," as such custodian and such funds are to be held and disbursed by him not as he is required under the Constitution to hold and disburse funds, that is to say, upon the order of the Comptroller countersigned by the Governor. Under the Act he is a mere depositary of funds and disburses them upon the Comptroller's order. An administration agency of county funds to the extent named in the Act is created and one member of such agency is empowered to expend the funds to be administered.

The Act declares that all roads and bridges which have heretofore been built in whole or in part from the proceeds of bond issues by counties or special road and bridge districts are beneficial to the State at large and have contributed to its general welfare, settlement and development. The word "bonds" is defined to mean bonds, time warrants, notes and other forms of indebtedness issued for road and bridge purposes. Here is a legislative declaration that all such indebtedness was incurred for State and county purposes and not solely for county purposes, although in Lewis v. Leon County, 91 Fla. 118, 107 So. R. 146, this Court expressed the view by a majority of its members that "such purpose is a county purpose within the meaning of Section 5 of Article IX of the Constitution" which inhibits counties from assessing and imposing taxes for any purposes other than county purposes.

The legislative declaration that such county and special district roads are beneficial to the State is a truism. The fact cannot be reasonably denied, but this Court said nevertheless that road and bridge construction by counties were county activities and indebtedness incurred for aid in the building of State highways was incurred nevertheless for county purposes and for no other purpose.

The purpose of the legislative declaration therefore is

obvious. It is designed as the basic principle on which the remaining provisions of the Act shall rest. The postulate supporting the policy declared by the particular Act and others in *pari materia,* the argument being: The State may levy and collect taxes to defray as State expenses all indebtedness incurred by counties for construction work beneficial to and contributing substantially to the State's general welfare; county indebtedness for road building is an indebtedness incurred by a county for construction work beneficial to and contributing to the State's general welfare, therefore such county indebtedness may be paid by the State as a part of the State expenses. It is evident that a material fallacy exists here and it lies in the first premise which is a complete denial of a governmental policy established by our Constitution and followed by our legislative and judicial departments since the organization of the government.

All constructive work performed by a county within its legal authority to construct is in the last analysis work which is beneficial to and contributes substantially to the State's general welfare. In that sense the phrase "general welfare" as used in the Act would not justify listing the expense therefor as a State expense when in fact the work was for a county purpose and no other purpose. All such constructive work is not deemed to be the subject of a State expense.

The building of court houses, jails, urban and rural schools and county hospitals have been held to be county activities as distinguished from State activities and the expense incurred therefor county expense to defray which counties may levy and collect taxes. The same has been held regarding activities by counties in road and bridge construction. See Gamble v. State, 61 Fla. 233, 54 So. R. 370; Osban v. Cooper, 63 Fla. 542, 58 So. R. 50; Borland

v. Towles, 69 Fla. 125, 67 So. R. 640; Cotton v. Co. Comm'rs Leon Co., 6 Fla. 610; Lewis v. Leon County, *supra;* Advisory Opinion, 13 Fla. 687; Clifton v. State, 76 Fla. 244, 79 So. R. 707; Art. XII, Const. 1885; State v. L'Engle, 40 Fla. 392, 24 So. R. 539.

The validity of the indebtedness incurred for such work depends upon the character of the work as one for a county purpose and no other. The work having been completed and the county's bonds or promises to pay therefor, outstanding valid obligations for county purposes and no other purposes, it cannot later be declared to have been a State enterprise of such character as to justify the levying of a tax by the State for State expenses without impugning the county's authority to contract the indebtedness originally.

In other words, to say that counties may contract indebtedness for road building as a county purpose and no other and that the State may levy and collect taxes to pay such indebtedness because as the work was beneficial to the State the cost of it becomes a State expense is to occupy inconsistent positions because the indebtedness cannot be one incurred for a county purpose and no other purpose when the bonds or other evidences of indebtedness were issued and sold and then be transmitted into a State expense when they are to be paid. The purpose for which the indebtedness was incurred has not changed by the execution of the work. If the indebtedness was originally for a county purpose and no other and therefore a valid county expense to pay which the counties might levy and collect taxes, by what process of reasoning does the indebtedness become a State expense to pay which a State tax may be lawfully levied and collected?

It could be only upon the theory that the State may levy and collect taxes with which to pay county indebted-

ness lawfully created which must be for a "county purpose and no other purpose" as part of the State expenses for the fiscal year or as part of its existing indebtedness. Sec. 2, Art. IX, Constitution.

Under the State policy existing at the time of the passage of the acts in question county indebtedness incurred for county purposes and no other purposes was neither a state expense for any fiscal year nor part of the State indebtedness.

If the proposition announced in the next preceding paragraph is not true but the one announced in the paragraph preceding that is true, it follows that all county indebtedness legally incurred becomes in the last analysis a State obligation, part of the State expense for the fiscal year, or part of its indebtedness which it may pay when and in whatever manner the legislature may determine and no question of appropriation or equality and uniformity of taxation could be successfully raised, because each county item of indebtedness being a State debt it could make no legal difference which were paid first nor in what proportions they were paid.

It is contended by some that the State may take over the county indebtedness and pay the same as a matter of gratuity but which it could not do if it undertook by the same legislative act to authorize the counties to incur the indebtedness for a county purpose and no other purpose and provide for the payment of the same by the State, because that would be a subterfuge, they say, and the act would be void because of the subterfuge.

It would seem that if the term is an appropriate one to be used in relation to any State activity it could more appropriately be applied to the former method by which under the name of a "gratuity" it seeks to accomplish what its legislature has no power directly to accomplish,

viz.: the authorization of the issue of bonds by counties for county purposes only which shall become a State indebtedness to be paid out of funds derived by State taxation.

A State policy on any subject is not a thing to be divided into sections, which assume at different times varying relative importance to each other. It is an entirety as of any certain date and consists of all the laws in existence as of the date the policy is determined. If it is consistent with State policy to assume a county indebtedness and levy a State tax to pay it, what law would prevent the authorization by the State of such indebtedness and its promise to pay it which would not be applicable to the assumption of the indebtedness after it is created and the imposition of a tax to pay it?

Can there be a policy which prohibits the State from promising to pay a county indebtedness before it is created but which permits the State to pay it after it is created? A policy which prohibits the incurring of an indebtedness but permits the payment of it?

Is it not merely a playing with words to contend that while the State has no power to issue bonds or other indebtedness through its agencies, Advisory Opinion, 94 Fla. 967, 114 So. R. 850; Sec. 6, Art. IX, Const., it may nevertheless in effect say to the counties: while the State cannot assume your bonded or other indebtedness before you issue it, go on and issue it to the limit of your capacity and when it is issued and the work for which the indebtedness was issued is completed in whole or in part and the interest becomes due and a sinking fund should be created to repay the debt, the State will then have power by its Legislature to levy and collect a State tax with which to pay it but when the Legislature does that it must be understood that such action is a ''gratuity'' and not a binding

obligation because if the courts call it an obligation the act will have to be declared void and another act exactly like it enacted and called a "gratuity"? Does it take two acts of the Legislature to make valid what one act cannot make valid?

It is upon that fallacy, which I have endeavored to point out, that the act under consideration was passed and which the Attorney General and Mr. Mathews in behalf of the State attacked by a proceeding in quo warranto in which the right of the Administration Board and its members severally to function is challenged.

A careful reading of the act reflects the uncertainty of its author as to the validity of a policy which must be relied upon to support the act. First it is declared that road building by counties has been and will continue to be beneficial to the State and has contributed to its general welfare. It is obvious, however, that such declaration, in view of the decisions of this court, cannot make the indebtedness created by the counties for road building other than "a county purpose and no other purpose," so the act then proceeds to declare: second, that all indebtedness incurred by the counties for road purposes "shall remain obligations of said counties or special road and bridge districts respectively, and each of said counties or districts shall be *legally liable* for the full amount of its bonds so issued by it outstanding, together with interest thereon, until paid."

Now we have a government whose powers are supposed to be limited by a written constitution, at least all officers of the government and all electors who qualify are required to take an oath to support, protect and defend that Constitution, which places the purposes for which the power of taxation or the power to raise revenue may be exercised in two classes: State expenses and State agency

purposes, which latter include and are limited to counties, districts and municipalities. Art. IX, Const.

A municipal expense or indebtedness is not such an indebtedness as would support the levy of a State tax to pay. It creates no obligation upon the State to pay it, neither do the expenses or indebtedness of counties create a State obligation, and the act under consideration so recognizes the truth of that proposition because it declares: third, that it is not the purpose of the act to obligate the State "directly, or indirectly or contingently, for the payment of the obligations of any counties or the obligations of any special road and bridge district, or that the State *should* assume the payment thereof." Then why does the State undertake to exercise the power of taxation which is limited to "expenses of the State for each fiscal year and also a sufficient sum to pay the principal and interest of the existing *indebtedness* of the *State*"? Art. IX, Sec. 2.

The act itself answers the question: fourth, the "appropriations are made specifically for the benefit of the taxpayers and property owners of the State of Florida and for the purpose of rendering assistance to the various State agencies which have already performed part of the *functions resting upon* the *State*." (Italics mine.) That phraseology would sound well in a political document for the "hustings" but will it bear careful analysis from a constitutional standpoint? In the first place the purpose singles out a class of citizens for whose benefit the tax referred to is levied, viz.: "tax payers and property owners." A large percentage of the population, many of whom are qualified electors and many under the required age for the discharge of the duties of an elector, are excluded from the avowed purpose of the act; second, it declares that another purpose for which the assistance is rendered is the payment of indebtedness incurred by counties and districts

in the performance of a "function resting upon the State," which is equivalent to asserting that the counties issued their bonds and taxed themselves to pay them for a purpose that cannot be classed "as a county purpose and for no other purpose" because a function which in a State policy is a State function as distinguished from a county function must necessarily be a State purpose as distinguished from a county purpose. But that declaration is a denial of the views expressed by this court that taxation for county roads and State highways in the particular county is a tax for a "county purpose and for no other purpose."

The act by Section 3 imposes upon the State Treasurer the duty of receiving as County Treasurer Ex-Officio all securities, monies or claims which may be in the possession or control of county bond trustees or other officials charged with the administration of sinking funds of any county or special road or bridge district which have accumulated for the payment of bonds of such counties or road or bridge districts issued for the construction of roads and bridges. Such funds he is required to retain and deposit in banks to be approved by a Board of Administration created by the act. See Sections 3 and 17.

For the purpose of "administering the provisions of this act and such money as is available by law" the Board of Administration is created. See Sec. 12.

It is unnecessary to discuss here in detail the methods provided according to which the Board is to function and how the funds available or which may be made available by law are to be apportioned between the counties. The State Treasurer is required to keep a separate account for each county of any moneys to be received from any tax on gasoline and other like products of petroleum "applicable to the bonds of such county and of any special

road and bridge district therein, and (b) any personal property tax on motor vehicles similarly applicable." Section 13.

Chapter 14575, Laws of 1929, known as the Gas Tax Law, purports to provide for part of the funds to be administered by the Board of Administration. This act is the subject of the litigation involved in the cause of Mathews v. Ernest Amos, as Comptroller, and W. V. Knott, as State Treasurer. It is an act amending Chapter 9120, Laws of 1923, as amended, which impose a license tax of five dollars upon every dealer in gasoline or other like products of petroleum and three cents per gallon on gasoline sold by him. The act provided that two cents per gallon of such tax should go to the State of Florida for the use of the State Road Department and one cent per gallon of such tax should be equally divided between the counties of the State of Florida.

Chapter 10025, Laws of 1925, amended Chapter 9120 by imposing a tax of four cents per gallon on gasoline, which was distributed in the proportion of three cents to the State Road Department and one cent equally among the counties. Both acts were again amended in 1927 by Chapter 12037 but the gasoline tax levied and the distribution of it was not changed. Each act indicates a legislative intent to cover the entire subject matter. See State ex rel. Bradford v. Stoutamire, Sheriff, 98 Fla. 486, 123 So. R. 834.

The provision in each act as to that portion of the tax to be paid over to counties is that "one cent per gallon of such tax shall be equally divided between the counties of the State of Florida." In my opinion, that provision makes the one cent per gallon tax a State tax, as distinguished from a county tax levied by the Legislature, because if it were a county tax the money raised in each

county by such tax would be required to be used in the county where raised and not paid into a common fund to be equally divided among all the counties. Art. IX, Sec. 5, Const. of Fla. Such distribution would destroy the constitutional requirement of uniformity in taxation. But the acts have been put into effect, the tax collected, and the money distributed as they direct. Such administration of the law could be maintained only on the theory that the tax is a State tax and the distribution of part of it to the counties equally a mere "gratuity."

Chapter 14575, *supra*, the act under consideration, levies a tax of five cents per gallon upon gasoline, which the act declares to be made up of four separate taxes, viz.: first, a tax of two cents for use of the State Road Department; second, a tax of one cent to be apportioned to the several counties of the State in the proportion collected in such counties; third, a tax of one cent to be apportioned to each county in proportion that the indebtedness authorized, issued and outstanding in the county for road purposes or road and bridge purposes by the county or any road and bridge district therein on April 1, 1929, bore to the indebtedness of the same class of all the counties and special road and bridge districts of the state and, fourth, a tax of one cent per gallon to be apportioned equally among the several counties of the State.

In this act there was a departure by the Legislature from the plan theretofore followed by the addition of the second and third gas tax, by which one cent of the tax is apportioned to the county in which it is collected and one cent apportioned between the counties in the proportion that the county and special road and bridge district indebtedness bears to all such indebtedness of all the counties.

Here was a perfectly obvious effort by means of the exercise of the taxing power on the part of the State to pay

county and special road and bridge district indebtedness incurred for the construction and maintenance of county and district roads.

In the view I have of the limitations imposed by the Constitution, such legislative activity is not permissible if the tax in its entirety is to be considered a State tax.

Whatever may be the power of the legislature in the matter of providing for special assessments by its agencies for local benefits the power to levy a tax either ad valorem or excise in character for State purposes is limited by the Constitution to providing "revenue sufficient to defray the expenses of the State for each fiscal year and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State." Art. IX, Sec. 2, Const.

The county bond issues are declared by the act to be no existing indebtedness of the State. Is then such indebtedness and the yearly accrual of interest thereon "expenses of the State for each fiscal year"? Certainly not if such indebtedness is not an existing indebtedness of the State. If it were an existing indebtedness of the State it would be the duty of the Legislature to raise the revenue sufficient to defray such expenses for each fiscal year because the language of Section 2 of Article IX of the Constitution is mandatory in character but the terms of the act deny that there is any obligation upon the State to pay the indebtedness which must be taken as a legislative determination that the revenue sought to be raised by the tax, the proceeds from which is sought to be appropriated to counties for road and bridge indebtedness, is not for State expenses.

If the gasoline tax levied by the Act, Chapter 14575, *supra,* is a State tax but not for the purpose of raising revenue for State expenses, its justification must be found in the power of the Legislature to raise money by taxation

for the purpose of making donations to State agencies to aid them in the payment of obligations which the State is in no way whatever bound to pay and as was said in Martin v. Dade Muck Land Co., 95 Fla. 530, 116 So. R. 449, cannot directly or indirectly pay by State taxation without violation of Section 6, Art. IX, of the State Constitution.

The lack of legislative power to pay such obligations by a State ad valorem tax was decided in the case above cited. It is contended that as the tax provided for by Chapter 14575, *supra,* is an excise tax the case cited is not analogous and constitutes no authority in support of the attack on the tax.

The power to levy taxes is not one varying in degree accordingly as the tax happens to be an *ad valorem* tax or a tax on licenses which includes excise taxes. See Amos v. Gunn, 84 Fla. 285, text 360, 94 So. R. 165.

The exercise of the power by the Legislature is limited by the terms of the Constitution to "raising revenue sufficient to defray the expenses of the State for each fiscal year and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State." Art. IX, Sec. 2, Constitution.

Whether the class of taxes levied be *ad valorem* or a tax on licenses, the only two classes of taxes which can be levied for State purposes, Afro-Am. Ind. & Benefit Ass'n v. State, 61 Fla. 85, 54 So. R. 383, it is the exercise of the power of taxation which in the Martin-Dade Muck Land case the Court held could not be exercised in order to pay obligations for which the State was not bound.

I am, therefore, impelled to consider the second, third and fourth gas tax as a county tax levied by the Legislature under Section 5 of Art. IX of the Constitution, in which the power is conferred upon the Legislature to "also

provide for levying a special capitation tax, and a tax on licenses." I use the term "conferred" because Section 2 of Article IX of the Constitution is a limitation upon the power of the Legislature to raise revenue and is limited to the purpose set out in that section. In Section 5 of the same article, however, the power was extended to the levying of a capitation tax and a tax on licenses.

It is only upon the theory that the second, third and fourth gas taxes are county taxes that they may be sustained.

A statute must be so construed, if fairly possible, as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score. See Burr v. Florida East Coast R. Co., 77 Fla. 259, 81 So. R. 464; U. S. v. Jin Fuey Moy, 241 U. S. 394, 60 L. Ed. 1061, 36 Sup. Ct. R. 658.

Now there is a provision in Section 1 of the Act, Chapter 14575, which affects the second gas tax by requiring it to be apportioned to the several counties in the same manner as the third gas tax is required to be apportioned.

I conclude, therefore, that the second, third and fourth gas tax cannot be supported as a county tax if the funds derived therefrom are to be apportioned in the manner required by the Act because such an apportionment would destroy the constitutional requirement of uniformity in taxation.

To take money by way of taxation from all the counties of a State, put it into a common fund, and then redistribute it accordingly as a certain character of indebtedness in each county bears to the indebtedness of like character in all counties is to avoid the constitutional requirement of uniformity of taxation, destroy the theory of local self-government by counties and potentially hold one county to a payment in part of the indebtedness of an-

130

other county.  A tax must be laid, said Mr. Justice
Cooley, according to some rule of apportionment; not
arbitrarily or by caprice, but so that the burden may be
made to fall with something like impartiality upon the
persons or property upon which it justly and equitably
should rest.  A State burden is not to be imposed upon any
territory smaller than the whole State nor a county burden
upon any territory *smaller* or *greater* than the county.
People v. Salem, 20 Mich. 452, text 474.

To undertake to sustain the apportionment upon the
theory that gasoline is purchased in one county and may
be used in driving motor propelled vehicles upon the roads
in other counties is to attempt to imprison the delicate
softness of a summer night's zephyr in the wide meshes of
a tennis net.

The conclusion to which I am forced is that the second,
third and fourth gas tax as collected in each county must
be paid into the treasury of the county in which collected
to be expended in such county upon the indebtedness of
such county incurred for road and bridge construction and
maintenance.

The one cent per gallon gasoline tax levied by Chapter
14573, Acts of 1929, is a State tax for public free schools
and should be apportioned to the counties as directed by
Section 7 of Article XII of the Constitution.